MILLER ELEVATOR COMPANY, INC.

v.

The UNITED STATES.

No. 90–154C.

United States Court of Federal Claims.

Feb. 24, 1994.

David L. Campbell, St. Louis, MO, attorney of record, for plaintiff.

Harold D. Lester, Jr., Washington, DC, with whom was Assistant Attorney General Stuart M. Gerson, for defendant. Gerald L. Schrader, General Services Administration, of counsel.

## OPINION

YOCK, Judge.

■ This Government contract dispute arose out of an elevator maintenance contract between Miller Elevator Company, Inc. (Miller), and the General Services Administration (GSA). The contract required the provision of elevator maintenance services for a federal office building in St. Louis, Missouri. Sixteen months after the execution of the contract, and without prior notice to Miller, the GSA authorized substantial renovation to the building. Following the commencement of the building renovation, the plaintiff claims that the amount and extent of work required to maintain the building elevators exceeded the scope of the maintenance contract. For the nondisclosure of the contemplated renovation of the building, the plaintiff seeks an equitable adjustment for the additional maintenance required for compliance with the contract terms, and for the extent of additional repairs also required by the renovation, the plaintiff further seeks recoupment of these costs as changes to the contract. The defendant rebuts these claims on the basis of the failure to secure the written approval of the contracting officer for work considered outside of the scope of the contract, the lack of authority for the instructions to perform certain repairs and additional maintenance work, and the otherwise general noncompliance with the terms and conditions of the contract in adhering to the maintenance requirements and responding to repair requests for the elevator systems within the building.

After a trial on the liability and damages, and upon consideration of the entire record, including oral and documentary evidence, as well as appropriate pre- and post-trial briefings, this Court concludes that the plaintiff prevails in this action. For the reasons stated herein, this Court finds that the Government breached the implied duty of good faith and fair dealing by the nondisclosure of superior knowledge regarding the fact that the

GSA had anticipated the letting of a $42 million contract for the renovation of this federal office building after contracting with the plaintiff for elevator maintenance services. Moreover, in view of the prior course of dealing between the GSA and this elevator maintenance contractor, this Court further concludes that the amount and extent of repair work subsequently required by the GSA extended well beyond the scope of the contract and thus comprised constructive changes to the contract.

In view of these affirmative liability findings, this Court likewise affirms the damages claimed by the plaintiff. Accordingly, this Court grants the plaintiff an equitable adjustment in the amount of $75,615.21, plus costs.

### Facts

On June 18, 1986, the parties to this suit executed GSA contract No. GS06P86GXC0066 (the Mart contract). The contract encompassed a term of three years, from July 1, 1986 through June 30, 1989, and carried an annual price of $70,980, divisible into a monthly service fee of $5,915. The contract provided for elevator maintenance and call-back services within the Mart Office Building (the Mart building), a federal office building in St. Louis, Missouri, renamed the Robert A. Young Federal Building after renovation. Constructed in 1932, the fifty-year old building provided office space for federal workers in the St. Louis area and contained fourteen elevators to service these personnel. Although the initial elevator systems dated to 1932, the GSA upgraded all of the elevators during the 1960's.

The contract at issue required the provision of regular and routine maintenance for all of the elevators in the Mart building. The building is comprised of a dual-level highrise, with one ten-story structure adjacent to another six-story structure. Eight elevators serviced the taller structure while another six elevators serviced the smaller six-story structure. In all, the Mart building contained eleven passenger elevators (Nos. 1, 2, 3, 4, 5, 7, 8, 9, 12, 13, and 14) and three freight elevators (Nos. 6, 15, and 18). Since 1977, less one intervening term from 1980 through 1983, Miller had provided the elevator maintenance services for all of the elevators within the Mart building to the satisfaction of the GSA. Miller had, in fact, provided these services as the elevator maintenance contractor for the immediately preceding contract.

On July 1, 1986, Miller began performance on the instant contract. Almost one year later, during late June of 1987, the GSA or persons under the direction of the GSA initiated mobilization activities in preparation for the renovation of the Mart building. Yet, from the time of execution of the instant contract in July of 1986, the GSA had disclosed nothing about the anticipated renovation before the initiation of these activities. Mobilization, and even some demolition, had begun before the GSA had provided any formal notice of the plans for renovation of the Mart building to the elevator maintenance contractor.

On June 30, 1987, the GSA first informed Miller of the intended renovation. On this date, pursuant to the ensuing demolition and replacement of certain elevators, the GSA instructed Miller to delete all the elevators in the ten-story high-rise from the contract. Under this partial termination for convenience, the GSA required termination of maintenance and call-back services to the eight elevators in the ten-story high-rise but retained the contract as to the six elevators in the six-story high-rise. Nevertheless, although Miller submitted a downward price adjustment on July 9, 1987, the GSA delayed the termination for convenience until November 10, 1987, four days after securing a construction contractor for the renovation.

On November 6, 1987, some five months after the initiation of mobilization and demolition activities at the Mart building, and sixteen months after the execution of the contract at issue, the GSA finally executed a formal renovation contract for $42 million with the J.S. Alberici Company (Alberici) for the refurbishment and remodeling of the Mart building. Due to the scope of the mobilization and the extent of demolition required by the renovation, the Alberici contract resulted in a substantial and detrimental impact upon the elevator systems within

the Mart building. As a result, on May 31, 1989, GSA terminated the instant Mart contract for the convenience of the Government.

On July 6, 1988, and later in a certified claim dated October 24, 1988, Miller submitted a claim for an equitable adjustment to the contracting officer for the Mart contract. This claim sought the extra maintenance costs associated with the mobilization, demolition, and renovation activities, as well as the extraordinary costs of major repairs to various components of the elevator systems in the Mart building. Following the denial of the claim on February 17, 1989, Miller brought suit in this Court.

Mechanics of an Elevator System

To ascertain the type of work required under the instant contract, including regular and routine elevator maintenance as well as call-back services for corrections and repair, it is helpful to review an elevator system and the mechanical requirements for the proper operation thereof.

A typical elevator system includes an elevator shaft in which an elevator car moves, a motor room atop the shaft, and an elevator pit below the shaft. The elevators in the Mart building conform to this generalized elevator system. The elevator shafts in the building contain "track-on-rail" systems on which the elevator cars ride during assent and descent. A typical motor room houses electric elevator motors, elevator brakes, and the bulk of other heavy machinery. In the Mart building, the motor room houses semi-enclosed gearless motors for the passenger elevators and semi-enclosed geared motors for the freight elevators. A typical elevator pit extends beneath the elevator shaft and, along with the elevator shaft and motor room, contain electrical mechanisms which control the various functions of the elevator system. The elevator pit in the Mart building conforms to this description. Despite the relative inaccessibility of the components of a typical elevator system, each of these three components requires regular and routine maintenance for proper operation.

The elevator shaft requires the most maintenance. In the Mart building, with the track-on-rail system, the tracks in the shaft on which the elevator car moves require particular attention. Although these tracks utilize either a "slider" or "guide" to assist the movement of the track along the rails, any structural intrusions into the shaft could inhibit this movement and jeopardize the safety of persons riding within the elevator car. The elevator shaft not only requires complete structural integrity but also proper environmental conditions for proper function. Environmental conditions (such as temperature, humidity control, and general cleanliness) concern important conditions not only for the effect upon the elevator car but also for the effect upon the lubricants on the rails within the shaft. Excessive heat or moisture could destroy the lubrication on the rails and impede the function of the track-on-rail system. Prior to the renovation, Miller had experienced no unusual problems with the maintenance of the elevator shafts or the track-on-rail system in the Mart building.

The motor room also comprises an essential maintenance component of the elevator system. Similar to the elevator shaft, these rooms require structural integrity to protect the motors, brakes, hoists, and other electrical and mechanical equipment. In addition, these rooms also require constant and steady voltage because inadequate or irregular voltage may cause damage to the equipment. The motor room also requires proper environmental conditions. Excessive heat causes damage to the internal components of the electric motors, and excessive humidity or water causes rust and structural degradation. The motor rooms also require minimal levels of cleanliness, particularly for semi-enclosed motors such as those in the Mart building. Generally, to provide for the foregoing requirements in the motor room, proper preventative measures include the structural enclosure of the motor room with the regulation of atmosphere by conditioned and filtered air flow. Prior to the renovation, except perhaps for the operation of a ventilation fan in the motor room to the passenger elevators of the six-story building, Miller had experienced no unusual problems with the maintenance of the motor rooms in the Mart building.

Although not as critical as the elevator shaft and motor room, the elevator pit also demands minimal cleanliness for the safe op-

eration of the elevator car. In addition to housing some of the elevator electrical components, the elevator pit enables access to the underside of the elevator car and to the bottom of the elevator shaft. The elevator pit also contains buffer stands for regular and emergency descent. Prior to renovation, Miller had experienced no unusual problems with the maintenance of the elevator pits in the Mart building.

Thus, prior to the initiation of the 1987 renovation and demolition activities, the conditions of all the components of the elevator systems at the Mart building fell within the standard norms. Indeed, these conditions had been confirmed by prior inspection.

Elevator Inspections at the Mart Building

As the elevator maintenance contractor for the previous elevator maintenance contract at the Mart building, Miller remained well appraised of the structural and environmental conditions of the elevator systems in the building. Additionally, prior to the initiation of contract performance on the most recent contract, Miller had conducted two inspections of the elevator systems within the Mart building.

In the first inspection prior to award, Miller had examined the elevator equipment at the Mart building in order to bid on the elevator maintenance contract. In preparing for that bid, the plaintiff provided the following description:

> In preparing its bid for the contract, Miller took into account the number of elevators, number of stops, condition of the equipment, foreseeable major repair work, and the time required to do the job. The passenger elevators were gearless machines and the freight elevators were geared machines, and generally, gearless machines require more maintenance. Although these machines were 30–35 years old, the age of the equipment is not really important since older equipment typically does not require more maintenance. In reaching its $5,915 price, Miller figured the number of elevators, the number of floors, the amount of time necessary to do routine maintenance, and applied an hourly factor for labor. Estimates of the time required to perform routine maintenance on specific types of machinery can be accurately made, and the typical time spent in routine maintenance is one hour per elevator per month. * * * Before bidding on the contract, representatives of both Miller and the government walked through the building and inspected the elevators, * * * in the Mart building. Miller found the equipment to be in good shape at that time and free from rust.

Plaintiff's Post–Trial Brief, at 2–3 (citations omitted). Based on the foregoing inspection, Miller bid on the Mart contract in anticipation of servicing fourteen elevators in a federal office building.

The second inspection occurred subsequent to the award of the contract. The Mart contract required that the elevator maintenance cóntractor perform a complete systematic inspection of the elevator equipment and systems prior to initiating contract performance. Mart Contract § C(2). In conformity with section C(2), Miller reinspected the equipment and systems at the Mart building and found no abnormal or unusual conditions. Further, based on the prior periods of contract performance for elevator maintenance at the Mart building, Miller had antecedent knowledge of the conditions of the elevator equipment and systems.

Once Miller performed the foregoing inspections, the GSA ordered the continuation of maintenance services to the Mart building by this elevator maintenance contractor. Under the terms of the Mart contract, these services primarily included the provision of regular and routine maintenance and callback services.

Routine and Regular Maintenance

To provide for the proper operation of each elevator, the entire elevator system requires maintenance on a regular and routine basis. As discussed in expert testimony at trial, such routine and regular maintenance requires the preservation of humidity and temperature control, steady voltage, and a clean operating environment. Under the terms of the Mart contract, however, the elevator maintenance contractor maintained responsibility only for the preservation of a

clean operating environment. All other conditions were the responsibility of the GSA.

The Mart contract contained a typical preventative maintenance schedule for elevators in Government contracts. The preventative maintenance schedule required either inspection, cleaning, or lubrication of the controller, selector, hoist machine, MG sets, signal and dispatching, car, hoistway, pit, emergency operation, governors, ropes, pumping units, and jack assembly, as well as the various components of each, on an annual, semiannual, quarterly, or monthly basis. Mart Contract § C(3). By compliance with these contract specifications, the Mart contract secured compliance with the requirements of the American Standard Safety Code for Elevators as well as other applicable laws, regulations, rules, codes, or other requisite elevator system standards. Mart Contract § C(1)(B). Thus, in providing for the regular and routine inspection, cleaning, or lubrication of certain elevator components, the contractor maintained the cleanliness of these components for proper operation.

Pursuant to the maintenance provisions of the Mart contract, the elevator maintenance contractor had the responsibility only for the performance of the preventative maintenance schedule. The sole exception encompassed conditions caused by ordinary wear and tear. Mart Contract § C(1)(D). Resultingly, aside from these conditions and from the preservation of a clean operating environment, as ensured by the preventative maintenance schedule, the elevator maintenance contractor maintained neither responsibility nor control of the temperature, humidity, or steady voltage to the elevator motors. These environmental conditions remained within the exclusive control of the GSA. Thus, if maintenance requirements arose as a result of these conditions, the performance of work to correct the problems associated with the temperature, humidity, or steady voltage would fall outside of the scope of the Mart contract. Additionally, for any such work outside of the scope of the contract, sections E(1)(A) and H(3) of the contract required the written approval of the contracting officer.

In some cases, when such extraordinary causes of repair resulted in the need for additional maintenance, the GSA requested assistance under the "call-back service" provision of the Mart contract.

Call-back Service

In addition to the requirement for the provision of regular and routine maintenance pursuant to the terms of the preventative maintenance schedule in the contract, the Mart contract also provided for regular and overtime call-back service.

Upon a request by an authorized representative of the GSA, the Mart contract made the following provision for "call-back service" at the Mart building:

The Contractor shall provide regular and overtime call-back service when requested by authorized representatives of the Contracting Officer.

Regular call-back service consists of responding (within 1 hour) to requests from the Government by telephone or other means during the hours of 8:00 a.m. through 5:00 p.m., Monday through Friday, Government holidays excluded.

Overtime call-back service consists of promptly responding (within 1 hour) to requests from the Government by telephone or other means for overtime service, at any hour other than the time defined as regular call-back service above.

Mart Contract § C(5) at 11. If a GSA representative required service during normal business hours (between 8:00 a.m. and 5:00 p.m.), or for "regular call-back service," the contract contemplated the provision of common maintenance and repair services without charge. If a representative required service at other times, the contract provided for additional compensation for these "overtime call-back services."

As for the scope of any overtime services, the call-back service provisions of the Mart contract contemplated the maintenance and repair of the elevators in the Mart building regardless of the cause of the malfunction. If an elevator became inoperable or otherwise damaged, a representative from the GSA contacted the contractor and requested service. Mart Contract § B(1). The Mart contract required call-back service within one hour during regular business hours. Mart

Contract § C(5). Upon responding to such a service call, if the contractor anticipated additional work, such as additional maintenance or repairs outside of the scope of the contract or required overtime service, the contract allowed for such and provided instruction on the procedures for approval. In contrast to work outside of the scope of the contract, which required written authorization by the contracting officer, the Mart contract only required specific invoicing for work required by overtime call-back service.

Elevator Deletions per the Renovation Contract

From the inception of the instant contract on July 1, 1986, the plaintiff had performed the foregoing contractual requirements to the satisfaction of the GSA. The performance problems arose, as well as the basis of this dispute, only after the disclosure of the renovation contract in June of 1987. During that time, more than one year after the execution of the contract at issue, Miller received the first formal indication of the contemplated renovation of the Mart building pursuant to a partial termination for convenience. Soon thereafter, the maintenance requirements and the number of regular and overtime call-back services increased dramatically.

On June 23, 1987, the contracting officer for the Mart contract first notified Miller of the anticipated renovation. On that date, the contracting officer ordered the partial termination of the Mart contract due to the anticipated $42 million renovation of the Mart building. The contracting officer directed: "Due to major renovation of the building, effective July 9, 1987, the Government would like to delete passenger elevators No.'s 7, 8, 9, 12, 13, and 14, Freight No.'s 6 and 15 for the above mentioned contract." Letter from Carl Harper, Chief, Building Services Contracts Branch, Contracts Division, Public Buildings Service, GSA, to Miller Elevator Company, Inc. (June 23, 1987). Thus, due to the renovation, the contracting officer ordered the deletion of eight (of the fourteen) elevators covered by the Mart contract. Pursuant to this termination for convenience, the GSA ordered the closure of the ten-story high-rise, including the replacement of the eight elevators therein, with the continued use of the smaller six-story high-rise, with the six elevators therein.

On July 9, 1987, Miller complied with the direction of the contracting officer. Under the terms of the termination, Miller retained maintenance responsibilities for six elevators, consisting of five passenger elevators (Nos. 1, 2, 3, 4, and 5) located in the front of the smaller six-story building and one freight elevator (No. 18) located in the back of the building. The deleted elevators had been scheduled for destruction and replacement. Applying a pro rata reduction in the monthly maintenance fee, Miller reduced the monthly maintenance from $5,915 per month for fourteen elevators to $2,700.01 per month for six elevators. Notably, Miller reduced the maintenance fee with the understanding that the elevator maintenance specifications would only encompass the normal maintenance requirements and call-back services for a federal office building still in use and not of a building under renovation. Under the terms of the termination, therefore, Miller anticipated only regular official and public use of the elevator systems.

On August 31, 1987, however, the contracting officer retracted the termination order of June 23, 1987. Apparently, the GSA had experienced difficulties in securing a contractor for the renovation contract and accordingly instructed Miller to continue maintenance and call-back services for *all* the elevators in the Mart building. Although Miller had already discontinued maintenance services to the terminated elevators, Miller nevertheless complied with the contracting officer's request. Eventually, on November 23, 1987, pursuant to the lengthy delay in securing the construction contractor, the contracting officer executed the contract modification whereby the GSA terminated eight of the fourteen elevators in the Mart building for the convenience of the Government, applicable retroactive to November 10, 1987. Although the defendant proffers this modification as a bilateral agreement, the modification recited a clear termination for convenience:

WHEREAS, the contract provides that the performance of work thereunder may at

the convenience or option of the Government be terminated by the Government in whole or from time to time in part, where any such termination is determined to be in the best interest of the Government, and that the Contractor and Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of such termination; and

.WHEREAS, the Government is terminating Elevator Numbers 6, 7, 8, 9, 12, 13, 14, and 15, as found on page 25 of the contract effective, midnight, November 10, 1987; and

WHEREAS, the contract clause entitled "Termination for Convenience of the Government (Services) (Short Form) (APR 1984)" specified that in the event of termination, the Government shall be liable only for payment for services rendered before the effective date of termination;

NOW THEREFORE, the parties hereto agree to as follows:

ARTICLE 1—That this is a partial termination.

Mart Contract, Modification No. PS 03. Thus, pursuant to the contracting officer's unilateral termination order, Miller merely acceded to a downward adjustment in the contract price. Furthermore, despite the Government's opinions to the contrary, the $2,700.01 monthly maintenance fee for the remaining six elevators presupposed only normal maintenance and call-back services for a federal office building, not a major construction site.

### Initiation of Mobilization

As noted above, the GSA informed Miller of the anticipated renovation in June of 1987 but only modified the contract pursuant to the renovation in November of 1987. While the GSA contends that no renovation occurred prior to November, 1987, Miller began to experience maintenance difficulties at the Mart building within days of the date of notification of the anticipated renovation.

Even though the construction contractor only entered into a formal agreement with the GSA on November 6, 1987, the GSA or persons under the direction of the GSA had initiated preconstruction activities as early as June of 1987. Indeed, Miller first experienced an increase in maintenance requirements in June of 1987, and witnesses for the Government even admitted that Alberici began renovation mobilization before receipt of the notice to proceed on November 9, 1987. Despite the Government's denials, this Court concludes that some mobilization and/or demolition and/or renovation occurred well prior to the execution of the formal agreement regarding renovation with the construction contractor. Accordingly, whether occurring precedent or antecedent to the formal initiation of renovation at the Mart building, these mobilization, demolition, and renovation activities led to additional repairs as well as repeated call-back service maintenance requirements, far above the normal repair and service maintenance history for these elevators.

### Mobilization, Demolition, and Renovation Damage

As referenced above, proper maintenance of an elevator system requires the continuance of humidity and temperature control, constant and steady voltage, and a clean operating environment. Beginning in June of 1987, the initiation of mobilization, demolition, and renovation activities at the Mart building affected all of these variables.

Miller first experienced difficulty with maintaining the cleanliness of the elevator systems because of demolition contamination. The extent of the contamination included not only concrete and mortar dust but also included concrete bricks, tiles, and other large debris. The mortar and concrete dust permeated all of the elevator equipment. As explained at trial, an elevator shaft acts like a chimney, so just as smoke rises up a chimney, dust and debris also rise up an elevator shaft. As a result, the motor and concrete dust infiltrated not only the elevator shafts and the elevator pits but also the motor rooms. The contamination of the motor rooms presented a particular problem because dust and other particulate matter act as insulators to the internal components of the motors. Thus, in sufficient quantities, the contamination of a motor room could greatly endanger the proper and efficient

operation of critical elevator machinery: this "insulator effect" in part caused the damage at least to the field coils of passenger elevator No. 5. In addition to dust contamination, Miller also contended with various forms of debris, primarily in the elevator shaft and elevator pit. Frequently, during normal maintenance inspections, Miller would discover concrete bricks or pieces of tile atop the elevator cars and within the elevator pit. Additionally, responding to regular and overtime call-back service requests to maintain these areas comprised a substantial alteration in the amount of work necessary to comply with the contract requirements.

In addition to dust and debris contamination, the evidence also shows that the elevator systems operated on irregular and low voltage. In one specific example, voltage irregularities resulted in damage to the field coils within the motor of passenger elevator No. 3. An electrical elevator motor comprises an alternating current motor which drives a direct current generator. Within the electrical motor, a set of field coils create the magnetic field which in turn generates the direct current. The field coils comprise large bundles of wrapped wire, consisting of insulated copper wire wrapped and woven around an iron core. Each field coil weighs approximately two hundred pounds, and each elevator motor contains six such coils. Under normal operating conditions, an elevator field coil maintains an average life span of fifty to eighty years. Further, as the coils contain no moving parts, the coils require little maintenance: the only maintenance requirement within the Mart contract regarding the field coils comprised an annual aeration by the injection of forced air into the motor unit. In passenger elevator No. 3, the elevator mechanics established the problem of low voltage by the operation of the elevator systems. Assuming proper operation otherwise, when the field coils within an electric motor properly energize, the coils receive the requisite voltage (approximately 208 volts); however, if the coils fail to energize, then the problem must lie with voltage irregularities (voltages of less than 170 volts). Low voltage thus led to the overheating of the field coils in passenger elevator No. 3 and the resultant damage to the electrical motor.

In addition to the foregoing problems, Miller also contended with excessive and unpredictable temperature fluctuations. These oscillations in humidity and temperature generally resulted from the common losses of voltage during the mobilization, demolition, and renovation activities at the Mart building. In contrast to low voltage, where the voltage directed to a machine equals less than the specified voltage, loss of voltage represents the complete absence of voltage. Although the motor rooms for the elevators under the Mart contract contained ventilation fans, during the periods of voltage loss, these fans failed to operate. Apparently, as the building experienced erratic voltage loss throughout the renovation period, sometimes the elevators continued to operate but the voltage to the fans remained disconnected. On several occasions, as the ambient temperatures exceeded 130 degrees Fahrenheit, such conditions not only made elevator operation more difficult but also inhibited the maintenance and repair of the elevators. In one instance, such conditions led to substantial damage to passenger elevator No. 5: because of the extreme ambient temperatures in the motor room in the six-story high-rise, the field coils, brake coils, and generator for passenger elevator No. 5 eventually required either replacement or repair.

In addition to the three components of proper elevator maintenance, completely extraneous causes of damage also resulted in damage to the elevator systems at the Mart building. Thus, not only did Miller continue to contend with the extra *dust* and debris as well as voltage fluctuations and extreme humidity and temperature changes, but Miller also contended with the additional problem of water damage. The water damage at the Mart building resulted from several causes, including sandblasting, structural damage, and roof leakage. The initial water damage occurred when the construction contractor conducted sandblasting within the vicinity of the motor room. However, as the contractor also drilled holes in the elevator shaft, in the motor room, and at one point, had even sought to demolish the entire motor room structure, these items of structural damage resulted in the most water damage. More-

over, although the evidence shows that the roof atop the motor room had leaked previously, some of the construction atop the motor rooms allowed the further infiltration of water which fell directly upon the semi-enclosed elevator motors and other machinery therein. In fact, some evidence points to water damage as the cause of the motor failure in freight elevator No. 18.

Despite the extent of the damage to the elevator systems at the Mart building pursuant to the foregoing causes, Miller timely responded to every request for repairs or maintenance, and the Government fails to dispute this fact. In reply to these requests, Miller performed numerous repairs to remedy malfunctions because of equipment failure. Several of these repairs required substantial labor and material costs, including the replacement of the field coils in passenger elevator No. 3, the motor in freight elevator No. 18, and the field coils, the brake coils, and the generator in passenger elevator No. 5. Miller also performed frequent additional maintenance. Eventually, however, the maintenance requirements became so onerous that Miller became unable to rectify the problems before the same problems reappeared. Particularly after the execution of the formal renovation agreement on November 6, 1987, the elevator maintenance requirements increased threefold: before construction, Miller responded to four calls per unit per month, but after construction, Miller responded to twelve calls per unit per month. Accordingly, on May 31, 1989, the GSA terminated the Mart contract in full for the convenience of the Government.

As a result of the dramatic increase in maintenance requirements and the scope and cost of repairs, Miller requested additional compensation for the extra work performed.

The Dispute

The basis of the instant dispute involves the costs associated with three major repairs as well as the costs of miscellaneous repairs and additional maintenance. The initial dispute, however, solely involved the costs associated with the three major repairs.

As the preceding problems arose during the performance of the Mart contract, on July 6, 1988, Miller had submitted the invoices for these major repairs to Mr. Carl Harper, the contracting officer for the Mart contract. The invoices described the work on passenger elevator Nos. 3 and 5 and freight elevator No. 18. For the repairs on passenger elevator No. 3, in an invoice dated November 30, 1987, Miller requested payment of $5,949; for the repairs on passenger elevator No. 5, in an invoice dated May 6, 1988 and another invoice dated September 9, 1988, Miller requested payment of $5,880 and $921, respectively; and for the repairs on freight elevator No. 18, in an invoice dated January 8, 1988, Miller requested payment of $5,984. On July 21, 1988, Mr. Harper refused payment on all of these invoices based on the lack of certification and supporting documentation. On October 24, 1988, Miller filed another (certified) claim to Mr. Harper with supporting documentation in the amount of $57,118.19. On February 17, 1989, Mr. Harper rejected the claim in whole, stating that the Government had never approved the additional repairs in writing.

On February 15, 1990, the plaintiff submitted a complaint to this Court seeking an equitable adjustment in the amount of $57,-118.19. Therein, the plaintiff claimed that the additional repairs required by the renovation of the Mart building fell outside of the scope of the contract. Thus, based on the theories of cardinal change and nondisclosure of superior knowledge, the plaintiff sought an equitable adjustment. As for the defendant's assertions regarding the lack of written authorization for the extra work, the plaintiff proffered the defenses of waiver and estoppel. On April 16, 1990, the defendant filed an answer generally denying the allegations made by the plaintiff in the complaint. On October 20–22, 1992, this Court conducted trial in St. Louis, Missouri, on liability as well as damages. At trial, upon discovery of additional uncompensated maintenance claims as well as miscellaneous repair costs, the plaintiff presented evidence to support an increase of the equitable adjustment claim, for a total of $75,615.21.

For the reasons stated herein, this Court finds in favor of the plaintiff.

*Discussion*

In this case, the plaintiff seeks an equitable adjustment to recoup the additional maintenance costs as well as the costs for extra repair work performed because of the renovation of the Mart building. This claim requires an analysis of factual as well as legal questions.

Factually, the dispute involves whether the causes of the additional costs incurred by the plaintiff resulted from causes other than "ordinary wear and tear" or improper maintenance. The plaintiff contends that the mobilization, demolition, and renovation activities at the Mart building comprised the fundamental cause for the additional costs. The plaintiff also cites instances of inadequate building maintenance, beyond the control of the elevator maintenance contractor, as an ancillary cause for some of the other costs. In contrast, the defendant contends that most, if not all, of the additional costs resulted from ordinary wear and tear. While the defendant also recites the possibility of improper maintenance, the defendant presents not an iota of evidence of inadequate or improper maintenance by the plaintiff. As the factual portion of this Opinion demonstrates, and as further considered below, the plaintiff presents the most persuasive evidence as to causes for the additional costs in complying with this contract.

Legally, the plaintiff presents two theories of recovery. To recoup the additional maintenance costs, the plaintiff cites the Government's failure to disclose, or the nondisclosure of superior knowledge, regarding the anticipated renovation. To recoup the costs for the extra repair work, the plaintiff alleges a cardinal change in the terms of the contract. In contrast, the defendant generally disclaims any liability for the costs claimed by the plaintiff based on inadequate adherence to the contract terms. As for the failure to disclose superior knowledge, the defendant further argues that the plaintiff either possessed knowledge of the anticipated renovation, otherwise should have known of the anticipated renovation, or otherwise disclaimed any responsibility for additional costs associated with the renovation pursuant to contract modification. As for the alleged cardinal changes, the defendant disclaims any liability for the costs for extra repair work because of the plaintiff's failure to notify the contracting officer of work considered outside of the scope of the contract and because of the plaintiff's failure to secure the prior written authorization of the contracting officer or the contracting officer's representative for any additional work.

## I. Liability

While this Court finds that the clear majority of the damages for which the plaintiff claims compensation occurred after the initiation of either mobilization, demolition, or renovation activities at the Mart building, the question remains whether the plaintiff maintains a contractual right to such compensation. This issue involves the questions of nondisclosure of superior knowledge and cardinal (or constructive) change.

### A. Nondisclosure of Superior Knowledge

As an initial legal matter, the plaintiff seeks to recoup the additional maintenance costs incurred as a result of the renovation of the Mart building. For the additional maintenance requirements following the mobilization and demolition activities beginning in late June, 1987, and pursuant to a threefold increase in maintenance requirements following the execution of the renovation contact in November of 1987, the plaintiff seeks $20,-470.12 in additional maintenance costs. As grounds for this claim, the plaintiff proffers the theory of nondisclosure of superior knowledge.

Under the implied duty of good faith and fair dealing, the Government maintains an implied duty to disclose information fundamental to the preparation of estimates or contract performance. JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 192 (2d ed. 1986). Nondisclosure of superior knowledge defines this implied duty. *GAF Corp. v. United States,* 932 F.2d 947, 949 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992); *Broad Ave. Laundry & Tailoring v. United States,* 231 Ct.Cl. 1, 9, 681 F.2d 746, 750 (1982); *Bauunternehmung*

*v. United States,* 10 Cl.Ct. 672, 678 (1986), *aff'd,* 820 F.2d 1208 (Fed.Cir.1987). *See, e.g., Hardeman–Monier–Hutcherson v. United States,* 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1371–72 (1972) ("It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity."); *Helene Curtis Indus., Inc. v. United States,* 160 Ct.Cl. 437, 444, 312 F.2d 774, 778 (1963) ("Although it is not a fiduciary toward its contractors, the Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."). If the Government fails this duty, the Government breaches the contract. *Pia v. United States,* 7 Cl.Ct. 208, 211 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir.1987).

■ This Court, as well as its predecessor courts, have long recognized the duty of disclosure of superior knowledge. *Oceanic S.S. Co. v. United States,* 218 Ct.Cl. 87, 120, 586 F.2d 774, 793 (1978); *Wm. T. Thompson & Co. v. United States,* 26 Cl.Ct. 17, 23 (1992); *Hercules, Inc. v. United States,* 25 Cl.Ct. 616, 621 (1992); *Granite Constr. Co. v. United States,* 24 Cl.Ct. 735, 750 (1991). Throughout these applications of this implied duty, the courts have established the following four prerequisites: (1) the Government possesses knowledge of vital facts regarding a solicitation or contract, (2) the contractor neither knows nor should have known of the facts, by contract specification or otherwise, (3) the Government knew or should have known of the contractor's ignorance of the facts, and (4) the Government failed to disclose the facts to the contractor. *Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 717 (Fed.Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 3186, 105 L.Ed.2d 694 (1989); *Petrochem Servs., Inc. v. United States,* 837 F.2d 1076, 1079 (Fed.Cir.1988); *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 228, 654 F.2d 75, 80 (1981); *Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 82 (1992). Accordingly, this Court applies these four prerequisites to the case here.

As of the execution of the elevator maintenance contract at issue, the Government (and the GSA specifically) maintained knowledge of the anticipated renovation of the Mart building. Although the question of Government knowledge of the renovation remains undisputed, the Government challenges the lack of knowledge claims by the plaintiff. To rebut the plaintiff's assertions of ignorance, the defendant contends that the plaintiff maintained constructive knowledge of the renovation project. *See generally H.N. Bailey & Assocs. v. United States,* 196 Ct.Cl. 166, 178, 449 F.2d 376, 383 (1971) ("[T]he Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere * * *."). Due to the alleged publicity surrounding the project, the defendant argues that the plaintiff "should have known" of the anticipated renovation of the Mart building. As evidence, however, the defendant presents no other evidence than this oral proffer. Furthermore, the defendant presented this Court with not a single piece of documentary evidence of the apparent "publicity." In the complete absence of any evidence to support the proposition of constructive knowledge, this Court rejects the defendant's imputation of knowledge to the plaintiff. To the contrary, based on the occurrences outlined in the factual recitation of this Opinion, this Court concludes that the plaintiff in fact possessed neither actual nor constructive knowledge regarding the renovation project. As for the Government's lack of knowledge regarding the plaintiff, in contrast to application of constructive knowledge to the plaintiff, constructive knowledge seems more appropriate to impute to the Government because the Government should have known of the contractor's ignorance of the facts. Indeed, the plaintiff states, and the defendant admits, that the GSA failed to provide formal disclosure of the anticipated renovation of the Mart building until sixteen months after the initiation of performance. Also, in the Answer to the Complaint, the defendant admits that "the United States did not tell or disclose to plaintiff any plans for massive renovation of or its plans to convert the entire facility to a massive construction worksite

* * *." Answer, at 1–2. Accordingly, this Court finds that the Government should have known of the plaintiff's ignorance of the anticipated renovation and failed to disclose that fact. Based on the foregoing findings, the plaintiff demonstrates the prerequisites of nondisclosure of superior knowledge.

■ Once a party demonstrates the non-disclosure of superior knowledge, the party must still show reliance and injury by the failure to disclose. *J.A. Jones Constr. Co. v. United States*, 182 Ct.Cl. 615, 628, 390 F.2d 886, 893 (1968). Here, the plaintiff demonstrates both additional burdens of the damage sustained. As for reliance, the plaintiff computed the monthly elevator maintenance fee based on the plaintiff's prior experience as the elevator maintenance contractor at the Mart building. As such, the plaintiff made no provision for the additional maintenance costs associated with the renovation of the building, much less a renovation with the scope of $42 million. As for injury, because the renovation resulted in significant increases in the costs of regular and routine maintenance, and as these costs inured without precedent knowledge of the cause thereof, the nondisclosure of superior knowledge by the Government resulted in a direct injury to the plaintiff. Despite this clear showing, the defendant rebuts both reliance and injury.

The defendant argues that the plaintiff discovered the anticipated renovation before the plaintiff began to experience additional maintenance costs. Under this argument, as the plaintiff gained knowledge of the renovation from the date on which the GSA announced the partial termination for convenience on June 30, 1987, and as the plaintiff only began to experience excessive maintenance problems after that time, the defendant contends that neither reliance nor injury occurred during the period of actual nondisclosure (that is, from the time of execution of the contract on July 1, 1986, to the time of disclosure on June 30, 1987). Continuing this argument, for the period between the date of disclosure of the renovation on June 30, 1987, and the date for the formal initiation of renovation on November 6, 1987, the defendant claims a lack of nondisclosure of superior knowledge. Further, as for the pe-riod thereafter, the defendant contends that the plaintiff forfeited any claim for a breach of the implied duty of nondisclosure, subsequent to the modification of the Mart contract on November 10, 1987, by the failure to make an upward adjustment in the contract price. As noted by the plaintiff, and adopted by this Court, the error of the defendant's argument is based on the proposition that the June 30 notice and the November 10 modification relied upon a bilateral agreement.

While the defendant correctly portrays the chronology of events surrounding the Government's disclosure of the anticipated renovation, the fact remains that the elevator maintenance contractor continued under the terms of the three-year elevator maintenance contract as set forth in the July 1, 1986 agreement. Once the Government disclosed the renovation in June of 1987, the plaintiff had already established the monthly fee schedule for elevator maintenance at the Mart building, and this schedule remained in effect until November 10, 1987. Although the defendant attempts to portray the November 10 modification as a bilateral agreement among the contracting parties, with a concomitant period of negotiation over terms, the modification states the contrary. Indeed, as recited in the factual portion of this Opinion, modification No. PS 03 specifically states that the GSA had ordered a partial termination for convenience, encompassing all of the elevators in the ten-story high-rise portion of the Mart building. Mart Contract, Modification No. PS 03. Thus, in contrast to the claims of the defendant, this Court finds that the termination for convenience provided the plaintiff with no opportunity to renegotiate the terms of the contract. As a result, as the defendant presents no other evidence to rebut the finding of reliance and injury pursuant to the Government's nondisclosure of superior knowledge, this Court concludes that the GSA breached the implied duty of good faith and fair dealing.

As a final defense to the claim of nondisclosure of superior knowledge, the defendant contends that the plaintiff failed to adhere to certain contractual requirements. This Court considers that final defense to this

breach claim below, following the consideration of the plaintiff's second claim of cardinal (or constructive) change.

## B. Constructive Change

Under a second legal theory, the plaintiff seeks an equitable adjustment for the costs of three major repairs and other miscellaneous repair costs incurred as a result of the renovation of the Mart building. For the three major repairs, the plaintiff seeks an equitable adjustment in the amount of $42,628.72, and for the miscellaneous repairs, the plaintiff seeks an additional adjustment in the amount of $12,516.37, for a total claim of $55,145.09. As grounds for this claim, the plaintiff proffers the theory of cardinal change.

In reference to the two legal theories proffered by the plaintiff, as opposed to alternative legal theories for recovery, the plaintiff apparently separates the legal theories pursuant to the type of claim. The plaintiff offers a nondisclosure of superior knowledge analysis for nonattributable claims of additional maintenance costs (such as the general increase in maintenance costs) and a cardinal change analysis for the attributable additional maintenance costs (such as costs for specific repairs and the associated maintenance costs). This Court finds no need for such a division of analyses, as Government liability for the nondisclosure of superior knowledge extends to all the additional costs incurred by the plaintiff as a result of the renovation. Thus, this Court finds the Government liable for $75,615.21, inclusive of $20,470.12 for the nonattributable (maintenance) costs and $55,145.09 for the attributable (repair) costs, pursuant to the above described nondisclosure. Even assuming arguendo the contrary, this Court would nonetheless affirm these costs on a change theory. Here, the plaintiff proffers the "cardinal change doctrine."

██ A cardinal change describes a change outside of the scope of the contract and thus is not governed by the changes clause. Ralph C. Nash, Jr., *Cardinal Changes: A Theory Looking for a Home,* 5 NASH & CIBINIC REP. ¶ 48, at 126–27 (1991). In *Cray*

*Research, Inc. v. Department of Navy,* 556 F.Supp. 201 (D.D.C.1982), the United States District Court for the District of Columbia defined the standard and rationale for the doctrine as follows:

> The "cardinal change" doctrine prevents government agencies from circumventing the competitive procurement process by adopting drastic modifications beyond the original scope of a contract. The basic standard is whether the modified contract calls for essentially the same performance as that required by the contract when originally awarded so that the modification does not materially change the field of competition.

*Id.* at 203. Thus, a cardinal change defines work in contrast to the nature of the work contemplated by the contract. In view of this understanding of the standard, a cardinal change generally comprises "a drastic modification beyond the scope of the contract." *Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 275, 408 F.2d 1030, 1033 (1969). Yet, no rule of thumb exists to measure what constitutes a cardinal change. *Compare General Dynamics Corp. v. United States,* 218 Ct.Cl. 40, 56–57, 585 F.2d 457, 566 (1978) (finding a $100 million increase in a $60 million contract as within the scope of the contract) *with Peter Kiewit Son's Co. v. Summit Constr. Co.,* 422 F.2d 242, 255 (8th Cir.1969) (deeming a treble rise in the cost of the contract as outside the scope of the contract). As a result, application of the doctrine depends on the totality of each new set of facts and circumstances. *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 808, 442 F.2d 364, 369 (1971). Applying this standard to the facts of this case (a $75,615.21 adjustment to a $212,940 contract), and as the work performed entails the same nature of work as contemplated under the original contract (albeit of a different scope), this Court finds no change of the magnitude of a cardinal change.

Nonetheless, as the plaintiff requests an equitable adjustment for work outside of the scope of the instant contract, this Court understands the instant claim as that not of cardinal change but of constructive change.[1]

---

1. Professor Nash disfavors the use of the term, "constructive change," in favor of the term,

■ A constructive change occurs where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government. CONSTRUCTION CONTRACTING, at 533. The United States Court of Federal Claims recognizes the constructive change doctrine. *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 539 (1993). The predecessor courts to this Court have similarly defined and applied the doctrine. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 526, 455 F.2d 1037, 1051 (1972); *Ets–Hokin Corp. v. United States*, 190 Ct.Cl. 668, 674, 420 F.2d 716, 720 (1970); *Wm. A. Smith Contracting Co. v. United States*, 188 Ct.Cl. 1062, 1089, 412 F.2d 1325, 1340 (1969); *Peterson Builders v. United States*, 26 Cl.Ct. 1227, 1230 (1992); *Calfon Constr. Inc. v. United States*, 18 Cl.Ct. 426, 434 (1989), *aff'd*, 923 F.2d 872 (Fed.Cir.1990).

■ A constructive change entails two base components, the change component and the order or fault component. *Al Johnson Constr. Co. v. United States*, 20 Cl.Ct. 184, 204 (1990). The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed the work. *Embassy Moving & Storage Co. v. United States*, 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970); *Eggers & Higgins & Edwin A. Keeble Assocs., Inc. v. United States*, 185 Ct.Cl. 765, 785, 403 F.2d 225, 236 (1968). Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract. *Lathan Co. v. United States*, 20 Cl.Ct. 122, 128 (1990). While the constructive change doctrine provides a means for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue. *American Line Builders, Inc. v. United States*, 26 Cl. Ct. 1155, 1176 (1992).

■ Legal scholars have recognized five distinct types of constructive changes: (I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration. GOVERNMENT CONTRACT CHANGES, at 10–9 through 10–11; CONSTRUCTION CONTRACTING, at 534. The plaintiff here presents facts evidencing a type I constructive change.[2] To demonstrate a constructive

---

"contractor claim." Ralph C. Nash, Jr., *Changes and Claims*, in CONSTRUCTION CONTRACTING 501, 531–33 (George Washington University 1992); RALPH C. NASH, JR., GOVERNMENT CONTRACT CHANGES 10–2 through 10–5 (2d ed. 1989). Under the original understanding of jurisdiction for the administrative forums for contract disputes, questions of breach of contract extended only to those "arising under the contract." In order to resolve other claims for additional compensation, the boards allowed jurisdiction for so-called "constructive changes." These changes encompassed changes incurred either by an informal order of the Government or by Government fault. When the Contract Disputes Act of 1978 provided the boards with full jurisdiction over contract claims, the boards nevertheless continued to apply the law of constructive change. Despite the disparate jurisdictional bases, this Court and its predecessor courts have long adopted the term-of-art from the boards. *See generally Len Co. & Assocs. v. United States*, 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967) ("[W]e, as well as the Armed Services Board of Contract Appeals, have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform, albeit oral, constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the 'Changes' provision."). In view of the body of case law defining constructive change, for the time being, this Court continues to utilize the traditional nomenclature.

**2.** Although nondisclosure also comprises a basis for a type IV constructive change, as noted in the preceding analysis, the United States Court of Claims has determined that nondisclosure constitutes not a constructive change but a breach of contract. *American Ship Bldg. Co. v. United States*, 207 Ct.Cl. 1002, 1003 (1975). While nondisclosure may well fall within either category, this Court continues to treat claims based on the nondisclosure of superior knowledge not as constructive changes but as breaches of contract. *Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 717 (Fed.Cir.1988), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 3186, 105 L.Ed.2d 694 (1989); *Bauunternehmung v. United States*, 10 Cl.Ct. 672,

change for disputes over the contract requirements, the contractor must show the performance of work in addition to or different from that required under the contract (the change component), either by express or implied direction of the Government or by Government fault (the order/fault component). Here, the plaintiff asserts the occurrence of constructive changes to the Mart contract by the direction of Government representatives to perform work outside of the scope of the contract at issue. Thus, the plaintiff seeks to prove a type I constructive change pursuant to the orders of authorized Government representatives.

As for the change component of the constructive change doctrine, the plaintiff proffers the substantial repairs to three separate elevator systems in the Mart building as well as the additional miscellaneous repairs incurred as a result of the mobilization, demolition, and renovation activities. According to the plaintiff, the costs associated with the additional repairs represent work outside of the scope of the Mart contract. To evidence the scope of work for the Mart contract, the plaintiff notes that, aside from the requirements of the preventative maintenance schedule, the elevator maintenance contractor maintained no responsibility for the *extraordinary* causes of repair to the elevator equipment and systems at the Mart building. Indeed, the Mart contract provides explicit provision of this limitation:

> The contractor shall not be required to make renewals or repairs made necessary by reason of negligence or misuse of the equipment by persons other than the contractor, his representatives and employees, or by reason of any other cause beyond the contract of the contractor, except ordinary wear and tear.

Mart Contract § C(1)(D), at 5. *See also* Mart Contract § H(5)(B), at 19 ("The contractor shall also be responsive [sic] for refinishing, repairing, or replacing of additional parts *when necessary by ordinary wear and*

*tear, \* \* \*.*") (emphasis added). Accordingly, any "renewal or repair" required by any reason other than ordinary wear and tear fell outside of the scope of the contract. The defendant accepts this interpretation but, contrary to the plaintiff, argues that all the additional work performed by the plaintiff inured as a result of ordinary wear and tear.

As for the order/fault component of the constructive change doctrine, the plaintiff argues that authorized Government representatives of the GSA had ordered the above described work. To evidence these orders, the plaintiff points to conversations with the contracting officer's representative (COR) and the individual in whom the COR had delegated full authority as the COR delegate under the contract. As established at trial, under the Mart contract, Mr. Carl Harper represented the contracting officer, Mr. John Martin, the Field Office Manager for the Mart Field Office, represented the contracting officer's representative, and Mr. Michael Sisk, the Assistant Field Office Manager for the Mart building, represented the delegate of the COR. The plaintiff states that persons representing the elevator maintenance contractor had received either the express or tacit approval of Mr. Martin or Mr. Sisk for all additional work performed outside of the scope of the Mart contract.

The defendant strenuously objects to the plaintiff's characterization of the order/fault component of the constructive change doctrine, arguing that only the contracting officer (and then only by written order) maintained the authority to approve additional work under the terms of the Mart contract. To support this defense, the defendant points to the changes clause of the contract at issue. The changes clause in the Mart contract states:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes with-

678–79 (1986), *aff'd,* 820 F.2d 1208 (Fed.Cir. 1987). Nevertheless, as the herein described analysis of constructive change demonstrates, the plaintiff demonstrates a type I (contract interpretation during performance) as well as a type IV (nondisclosure of superior knowledge) constructive change. *See Johnson & Sons Erectors Co. v. United States,* 231 Ct.Cl. 753, 756–57, 1982 WL 1441, *cert. denied,* 459 U.S. 971, 103 S.Ct. 303, 74 L.Ed.2d 283 (1982) (considering the application of the constructive change doctrine to cases of nondisclosure).

in the general scope of this contract in any one or more of the following:

(1) Description of services to be performed.

(2) Time of performance (i.e., hours of the day, days of the week, etc.).

(3) Place of Performance of the services.

(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

Mart Contract, Supplemental Contract Clauses for Building Service Contracts (citing FAR 52.243–1(a-b), 48 C.F.R. § 52.243–1(a–b) (1984)). Thus, the defendant argues that the changes clause in the Mart contract allowed changes only by the written order of the contracting officer. To the contrary, the plaintiff argues that the Government representatives who required the work outside of the scope of the instant contract possessed independent contracting authority to order the additional work at issue.

In view of the foregoing, this Court must determine two questions. First, this Court must determine whether the additional work performed by the elevator maintenance contractor resulted from ordinary wear and tear or from other extraordinary causes. If the former, the plaintiff cannot prevail, but if the latter, then the plaintiff has satisfied the change component of the constructive change doctrine. Second, this Court must determine whether the elevator maintenance contractor performed the work pursuant to an express or implied order or by the fault of the Government. To make this dual finding, this Court conducts a detailed analysis of the plaintiff's claims for additional repairs.

The following analysis considers the four items claimed by the plaintiff as cardinal (actually constructive) changes to the Mart contract. For each item, the defendant claims that the repair inured as a result of "ordinary wear and tear." In contrast, the plaintiff presents evidence regarding temperature and humidity control, roof integrity, plumbing, electrical power supply, and voltage levels which tends to show extraordinary causes of renewal and repair. To distinguish these causes, the parties further proffer their own experts to establish the cause or causes of repair. For the plaintiff, Mr. Fred Wuelling, Jr., General Manager of Miller (1983–1987), and Mr. William Gerngross, General Manager of Miller (1987–Present), and Mr. Hank Brannan, the President of Miller, testified about the general administrative and performance aspects of maintenance and repair costs under the Miller contract. Mr. Richard Schroeder, a mechanic with Miller, also testified regarding the specific maintenance history of the elevator systems at the Mart building, and Mr. Conrad Markmueller, General Manager of Missouri Electric Company (Missouri Electric), Mr. John Phillips, Shop Foreman at Missouri Electric, and Mr. Morris Hampton, an elevator electrician with Missouri Electric, testified about the repairs performed on the field coils and brake coils for the elevators in the Mart building. For the defendant, Mr. Michael Bystrom, the elevator inspector for the Mart building and other federal buildings in Missouri, testified about the effect of the mobilization, demolition, and renovation activities upon elevator maintenance at the Mart building.

In view of these contrasting arguments as well as the expert testimony, this Court makes the following conclusions as to the four items proffered as constructive changes to the contract.

Item 1: Field Coils in Passenger Elevator No. 3

The first major component of the elevator system at the Mart building to become inoperable involved the field coils in passenger elevator No. 3 that was located in the smaller six-story tower. Upon initial inspection of the damaged field coils, the plaintiff's mechanics discovered that the coils had been "cooked like a piece of toast." To ascertain the reasons for the damage, Miller requested the opinion of Missouri Electric. Upon inspection of the field coils, Missouri Electric determined that the coils required an overhaul, involving the removal and rewinding of the coils. After the plaintiff informed Mr.

Sisk of the problem and of the recommendation by Missouri Electric, the plaintiff allegedly received oral authorization to proceed with the work. Accordingly, the plaintiff performed the work and returned the elevator to service.

As grounds for the repair, the plaintiff theorized that low voltage had caused the damage to the field coils in elevator No. 3. Low voltage forces the elevator motor to operate inefficiently: the inefficiency results in excessive heat which in turn may lead to the overheating and destruction of the field coils. Mr. Schroeder, the plaintiff's mechanic for the elevators in the Mart building, testified that the building frequently experienced voltage irregularities throughout the renovation process. While Missouri Electric remained unable to confirm the cause for the repair, the shop foreman clearly established that the cause resulted from a circumstance other than normal wear and tear. Mr. Phillips explained that when field coils burn out from normal use, the insulation on the wires that wrap the field coils would become brittle and the wire would become dark. Because the field coils in passenger elevator No. 3 had simply burned out, Mr. Phillips concluded that the cause for repair resulted from a reason other than normal wear and tear.

To the contrary, the defendant contends that the plaintiff has merely created a "best guess" for the failure of the field coils some years after the actual repair. However, just because the actual cause of the failure remains uncertain, it does not immediately follow that the repair resulted from ordinary wear and tear. Indeed, even the Government's elevator inspector, Mr. Bystrom, testified that the damage to the field coils in passenger elevator No. 3 resulted from causes other than ordinary wear and tear. As the defendant properly states, the plaintiff bears the burden of proving the cause of damage by a preponderance of the evidence. *Mega Constr. Co. v. United States,* 29 Fed. Cl. 396, 435 (1993). While this standard requires proof of the cause of damage, a preponderance standard requires nothing as strenuous as that suggested by the defendant. As relayed in the statement of facts in this Opinion, the conditions of the elevator

systems at the Mart building gradually deteriorated from July of 1987 onward. Whether the result of mobilization, demolition or otherwise, this Court finds that the plaintiff has met the burden of proof as to this repair.

As a final challenge to the costs for this repair, the defendant contends that the renovation contractor had not received a notice to proceed prior to November 6, 1987. As such, the defendant claims that the cause of this repair, which arose on November 3, 1987, could not have resulted by mobilization, demolition, or other renovation activities. While the defendant accurately depicts the chronological status of the Alberici contract, ample evidence exists that some mobilization, demolition, or other renovation activities occurred prior to the formal initiation of renovation activities by Alberici. Whether by the GSA or other parties under the direction of GSA, the evidence amply demonstrates a significant increase in the elevator maintenance requirements after June of 1987. Resultingly, this Court concludes that the plaintiff has presented sufficient evidence to prove that the cause of damage to the field coils on passenger elevator No. 3 resulted from extraordinary causes and was not simply the result of ordinary wear and tear.

Item 2: Motor in Freight Elevator No. 18

The next major component of the elevator system to become inoperable involved the hoist motor in freight elevator No. 18 that was likewise located in the six-story tower. Upon the initial inspection of the inoperable elevator, the plaintiff's mechanic testified that the motor smelled "just cooked." Confirming that the motor had "completely burnt up," Missouri Electric substantiated that the entire motor had been destroyed, including all of the field coils. As done by course of dealing, the plaintiff had allegedly obtained oral authorization for the repair from Mr. Sisk, and after obtaining such, returned the elevator to service.·

As grounds for the repair, the plaintiff theorized that the damage resulted from excessive starts and stops. Although Missouri Electric also discovered a "gritty substance" within the motor, Mr. Hampton, the electrician from Missouri Electric who repaired the motor, testified that the motor had been

destroyed not from dust contamination but from excessive starts and overloading. As Mr. Hampton explained, when a motor burns out under normal usage, the interpoles and field coils deteriorate simultaneously, but in the case of the motor in freight elevator No. 18, the field coils, but not the interpoles, had been destroyed. Mr. Hampton noted that this result almost always pointed to excessive starts and overloading. Again, to refute the plaintiff's analysis, the defendant presents the same argument of failure by ordinary wear and tear. To support this position, the defendant also demonstrated that a similar motor had burned out in the Mart building four years earlier and thus emphasized that the motor in freight elevator No. 18 more likely than not had burned out as a result of normal wear and tear.

To the contrary, the evidence supports the plaintiff's position. The evidence demonstrates not only that the analyses made by Missouri Electric deem plausible reasons for the failure of the motor in freight elevator No. 18, but also that this elevator experienced unusual and excessive use by the renovation contractor. The November, 1987, modification which reduced the Mart building from fourteen to six elevators also reduced the contract from three freight elevators to one. As such, the single freight elevator experienced substantial use by the renovation contractor throughout the mobilization, demolition, and renovation phase of the Alberici contract. In fact, the elevator required such extensive use that the renovation contractor stationed an operating engineer in the elevator to facilitate *continuous* use. As adduced at trial, moreover, the design of the motor in freight elevator No. 18 recommended against continuous use. The motor type for the single freight elevator contrasted with the motors for the passenger elevators: while the passenger elevators contained gearless motors which facilitate continuous use, the freight elevator at issue contained a geared motor which contemplated only occasional use. Thus, the renovation contractor not only used the freight elevator excessively but also misused the elevator as based on the elevator's performance specifications. These conditions lend not to ordinary wear and tear

but to extraordinary causes of damage and repair.

Item 3: Field Coils, Brake Coils, and the Generator in Passenger Elevator No. 5

The next major component of the elevator system to become inoperable involved passenger elevator No. 5 that was also located in the six-story tower. The field coils in this elevator first required repair. When the elevator became inoperable, the mechanic testified that the motor smelled "like somebody put a torch to it and burnt it." As with the field coils in passenger elevator No. 3, the coils in passenger elevator No. 5 likewise required removal and rewinding. Yet, upon inspection of the field coils in passenger elevator No. 5, the plaintiff's mechanic also discovered that the brake coils also required repair. According to this mechanic, excessive heat had warped the spool around which the brake coils wound which caused damage to the metal core of the spool: according to the shop foreman at Missouri Electric, only abuse and neglect would cause such damage to the spool. Accordingly, the spool required replacement and the brake coils required repair. Although occurring at a later date, the generator for passenger elevator No. 5 also required repair. For each repair, after allegedly securing oral authorization from Mr. Sisk, the plaintiff returned the elevator to service.

As grounds for the repair to the field coils, the plaintiff again proffers the testimony of Mr. Markmueller of Missouri Electric. Mr. Markmueller testified that the damage to the field coils most likely resulted from the high ambient temperatures in the motor room for passenger elevator No. 5. He explained that when a motor becomes too hot, the insulation coating the wiring of the field coils deteriorates which causes electrical shorts which in turn causes the coils to burn out. Although not specifically related, the plaintiff infers that the same temperature fluctuations also caused the damage to the brake coils and to the generator. To support this proposition, the plaintiff notes that the GSA had forwarded one invoice for repairs on passenger elevator No. 5 to the renovation contractor for payment. Despite the obvious relationship between the renovation activities and the

damage to passenger elevator No. 5, the defendant again rebuts the plaintiff's estimations of cause and claims that the repairs were necessitated by ordinary wear and tear.

In contrast, the evidence clearly shows that excessive temperature conditions existed within the motor room for passenger elevator No. 5. The plaintiff's witnesses confirmed that temperatures rose to more than 130 degrees Fahrenheit in the motor room, and that once Mr. Gerngross had removed a mechanic from a repair because of the extreme heat conditions. Mr. Gerngross also explained how the equipment in this motor room had been covered with a layer of dust and debris which, acting as an insulator, further intensified the effects of the heat on the equipment. Resultant not only from the temperature conditions within the motor room for passenger elevator No. 5 but also from the structural conditions, this Court finds that the general state of disrepair of the Mart building during the mobilization, demolition, and renovation efforts more likely than not resulted in the damage to passenger elevator No. 5. As an example of the structural conditions, Mr. Gerngross presented a photograph during testimony which depicted how the renovation contractor had installed a pipe above the motor for passenger elevator No. 5. The picture displayed how the contractor had drilled a hole in the ceiling, directly over the motor, without providing any protection to the motor and how the drilling caused debris to fall directly upon the motor. Such illustrations indeed demonstrate the extraordinary circumstances which occurred within this federal office building throughout the renovation process. Therefore, this Court again finds that extraordinary causes eventuated the damage to the components of this elevator.

Item 4: Miscellaneous Repairs

In addition to the foregoing major repairs, the plaintiff also seeks compensation for the additional labor required to perform the miscellaneous repairs pursuant to the mobilization, demolition, and renovation activities at the Mart building. These additional repairs were necessitated pursuant to the ever deteriorating conditions at the Mart building. On one occasion, the renovation contractor opened holes in the elevator shaft walls and later even attempted to demolish the supporting walls entirely. On another occasion, the renovation contractor drilled holes over one of the motors, through which water drained, which resulted in the rusting of the exterior of the motor, several hoist guides, and even the elevator cabling. Moreover, throughout the demolition and renovation activities, dust and debris infiltrated the entire elevator system which, toward the end of this contract, required that the plaintiff not only perform numerous minor repairs but also respond to daily call-back service calls for maintenance. Eventually, the repair and maintenance requirements for the passenger elevators and the service requirements for one elevator became so onerous that contract compliance became impractical. As evidence of such, on November 1, 1988, the GSA ordered the deletion of passenger elevator No. 5 from the maintenance contract, and on May 31, 1989, all of the other passenger elevators were likewise deleted from the maintenance contract. Mart Contract, Modification No. PS 05; Mart Contract, Modification No. PS 04. Once again, based on the foregoing, this Court finds that the conditions at the Mart building present extraordinary causes of damage and not "ordinary wear and tear."

For items one through four, in addition to claiming damages by ordinary wear and tear, the defendant also proffers the cause of damage by improper maintenance by Miller. As for this assertion, however, the defendant presents no evidence of any improper maintenance which resulted in a cause for repair to the elevator systems in the Mart building. Indeed, the defendant's own elevator inspector for the Mart building recited no evidence of improper maintenance by the plaintiff, and upon questioning, refused to denigrate the plaintiff's maintenance record. Furthermore, as established at trial, electric motors require little if any maintenance; thus, the destruction of a field or brake coil in the manner described above would result only from environmental irregularities (such as excessive heat, water infiltration, or substance contamination) or improper use (excessive stops and starts or overloading). The evidence indicates that the cause of the damage to the motors in the Mart building re-

sulted from causes other than improper maintenance. In view of the overwhelming evidence, including the fact that the GSA remained well satisfied with the work of Miller throughout the contract term at issue, as well as during prior terms, this Court rejects the defendant's proffer of improper maintenance.

Despite the protestations of the defendant to the contrary, this Court therefore finds that all the repairs performed by the plaintiff resulted from causes other than ordinary wear and tear. The oral and documentary evidence supports this view, as does the weight of the expert testimony produced at trial. In fact, the expert testimony constituted a persuasive and pivotal component of the plaintiff's case. The plaintiff proffered the testimony of Mr. Richard Schroeder, a certified elevator mechanic with the plaintiff corporation, Mr. John Phillips, an elevator motor mechanic with twenty-five years experience, and Mr. Morris Hampton, an elevator electrician with thirty-four years experience, to support the plaintiff's allegations as to the cause of damage to the elevator systems. The defendant proffered the testimony of Mr. Michael Bystrom, a certified elevator inspector, but not a certified elevator mechanic, nor a certified elevator motor mechanic, nor an elevator electrician, to refute the plaintiff's allegations. On the whole, the plaintiff's experts presented a more experienced and accomplished analysis for the causes of major repairs and additional maintenance to the elevator systems in the Mart building. In contrast, Mr. Bystrom possessed neither the experience nor the aspiration to provide a rationale for the elevator problems. As opposed to the analyses provided by the plaintiff's experts, Mr. Bystrom simply refused to submit a best guess, and even without an explanation of cause, obstinately refuted the educated predictions of cause by the plaintiff's experts. According to Mr. Bystrom, if unable to determine the cause of a repair, then the repair resulted from ordinary wear and tear. The hapless consequence of this type of reasoning lead to the Government's conclusion that every repair resulted from ordinary wear and tear, even though Mr. Bystrom had conducted an inspection of the elevators in the Mart build-

ing on but a single occasion (prior to the initiation of renovation activities). Unfortunately, in denying the plaintiff's initial claim, Mr. Harper had relied solely on Mr. Bystrom's unfounded bases of cause, and that error lead to this unnecessary proceeding.

In the foregoing analysis, this Court concludes that the additional work performed by the plaintiff resulted not from improper maintenance or ordinary wear and tear but by extraordinary causes. As such, this Court finds that the plaintiff indeed illustrates the "change" component of the constructive change analysis because work required from extraordinary causes extends outside of the scope of the Mart contract. To continue this analysis to the "order/fault" component, the question now remains whether the Government ordered the additional work, or by otherwise fault, remains liable for the work.

As noted above, the plaintiff contends that representatives of the GSA with formal contracting authority orally authorized the work at issue. For items one through three, the plaintiff states that the Assistant Field Office Manager, Mr. Sisk, had expressly approved the additional work, and for the various miscellaneous repairs of item four, the plaintiff further claims that Mr. Sisk, or another GSA representative with the approval of Mr. Sisk, had either expressly or tacitly authorized the work. As the Assistant Field Office Manager for the Mart building in St. Louis, Mr. Sisk supervised the day-to-day operations of the building. At trial, Mr. Sisk explained the procedure for the approval of work outside the scope of the contract. If the plaintiff discovered such work, the plaintiff requested permission to proceed from Mr. Sisk. If granted, after the plaintiff completed the work, the plaintiff presented a work ticket for signature. Mr. Sisk confirmed that he only signed the tickets if he had authorized the additional work. Thus, as Mr. Sisk testified that he had intended that the plaintiff receive payment for the work performed upon the execution of these work tickets, this Court finds that the Government indeed authorized the performance of additional work as set forth in the factual recitation of this Opinion. This Court further determines that the additional work at issue fell well outside

of the scope of the contract. When the plaintiff prepared estimates for the provision of regular and routine maintenance to the fourteen elevators at the Mart building, the plaintiff contemplated such work only for that of a functioning federal office building and not for that of a major construction site. The failure of the elevator components that precipitated this suit obviously resulted from the renovation of the building, and the contractor should not be required to bear the burden of circumstances created beyond its control. Based on the foregoing, this Court finds ample evidence of orders, pursuant to the "order/fault" component, to constitute a constructive change.

To summarize this Court's constructive change analysis, this Court finds that the plaintiff has demonstrated a change outside of the scope of the instant contract by the requisite burden of proof. As for the "change" component, the scope of work required of this elevator maintenance contractor extended well beyond that contemplated by the contract at issue. As for the "order/fault" component, the Government here either authorized the work before acceptance or allowed the performance of the work followed by acceptance. Therefore, as the plaintiff accomplished this additional work to the satisfaction of the defendant at the time of performance, this Court finds that the plaintiff has established a constructive change to the Mart contract.

The defendant nevertheless rejects the plaintiff's entitlement to an adjustment in contract price for the additional work performed outside of the scope of the Mart contract. As an initial matter, the defendant asserts that the plaintiff acted as a volunteer. To the contrary, contractors perform work only for payment, and absent evidence that this elevator maintenance contractor acted as a volunteer, this Court rejects the defendant's general denials of liability. *See Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 1050–51, 455 F.2d 1037, 524–26 (1972) (considering and rejecting the defense of contractor as a volunteer). Absent a finding on the volunteer reasoning, the defendant attempts to distinguish a finding of constructive change under a three-tier defense. First, to

distinguish the "change" component of a constructive change, the defendant rejects liability for any changes to the contract as the plaintiff failed to provide written notice of any work contemplated as outside of the scope of the Mart contract. Second, to distinguish the "order/fault" component of a constructive change, the defendant contends that the plaintiff never obtained the requisite authority for the performance of any such additional work. Third, even assuming a constructive change, the defendant proposes that the plaintiff has shown no entitlement to additional compensation because of the patent failure to comply with the contract's performance requirements. This Court considers these defenses seriatim.

### 1. Prior Written Notice

Because the plaintiff failed to secure prior written approval for the additional work in question, the defendant rejects any "change" to the Mart contract, either actual or constructive. While the defendant concedes that the Mart contract contemplated a procedure for the recoupment of additional compensation for work outside of the scope of the contract, as well as for any overtime callback services, the defendant argues that the plaintiff blatantly failed to follow the requirements for such remuneration. The Government attributes this failure to the absence of prior written approval for any of the additional work claimed by the plaintiff.

As the defendant points out, the Mart contract contains explicit provisions for the performance of work considered outside of the scope of the contract and for overtime callback services. As for work considered outside of the scope of the contract, the Mart contract provides:

> The contractor shall immediately notify the Contracting Officer (in writing) of the existence or the development of any defects in, or repairs required to the elevators which the contractor considers he is not responsible for under the contract to make necessary repairs. The Contracting Officer reserves the rights to make final determination as to responsibility.

Mart Contract § H(3) at 17. Thus, as the defendant demonstrates, the Mart contract

requires written notification to the contracting officer (or to the contracting officer's representative, who had in turn delegated his responsibilities to the Assistant Field Office Manager) regarding any work contemplated outside the scope of the contract. As for overtime call-back services, the Mart contract also provides:

> The Contractor shall provide overtime call-back service when requested, and shall submit a separate invoice for payment for each occurrence. Invoice for overtime call-back service on work that has been requested by authorized personnel shall be submitted to the Contracting Officer's representative listing the following information:
>
> (1) Date and time of call.
>
> (2) Time mechanic arrived on job.
>
> (3) Name of person originating call.
>
> (4) Nature of trouble.
>
> (5) Corrective action.
>
> (6) Total time spent on job.
>
> (7) Amount of billing.
>
> NOTE: Reimbursement for overtime call-back services will be limited to the actual time spent on the job, plus one-half hour round trip travel time for each call-back. Time will be computed to the nearest fifteen minute increment for payment purposes and the minimum payment for any overtime call-back will be for 1½ hours (including travel allowances). No other charges (including mileage) will be allowed for overtime call-back.

Mart Contract § G(2) at 16. As with the submission of written notification of work contemplated outside the scope of the contract, work for overtime call-back services likewise required a written invoice containing particularized information. In general, these writing requirements enabled the Government to decide whether to allow the expenditure and to provide an important prerequisite of contract performance. Thus, with regard to the notification of work, the defendant cites the total absence of any prior written notification in conformity with section H(3) of the contract, and with regard to the invoice for overtime call-back services, the defendant contends inadequate performance of the section G(2) requirements. Absent the written authorization of the Government, the defendant contends no liability arose for the work performed outside of the scope of the contract.

■■■ The defendant correctly states the general proposition that, if the contract requires written authorization for extra work, the writing requirement constitutes a condition precedent to recovery for any such work. *General Bronze Corp. v. United States,* 168 Ct.Cl. 176, 187–88, 338 F.2d 117, 123 (1964); *Penner Installation Corp. v. United States,* 116 Ct.Cl. 550, 565, 89 F.Supp. 545, 548 (1950), *aff'd,* 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651 (1950); *Globe Indemnity Co. v. United States,* 102 Ct.Cl. 21, 35, 1944 WL 3709 (1944), *cert. denied,* 324 U.S. 852, 65 S.Ct. 712, 89 L.Ed. 1412 (1945); *Samford v. United States,* 78 Ct.Cl. 572, 576, 1933 WL 1800 (1933). Even if a Government representative compels additional work, the Government escapes liability absent adherence to the terms of the contract (such as the written authorization of the contracting officer). *Woodcraft Corp. v. United States,* 146 Ct.Cl. 101, 103, 173 F.Supp. 613, 614 (1959). As with any general rule, however, this rule contains certain limitations under particular circumstances. In this case, the plaintiff proffers the exceptional circumstance of waiver and estoppel.

■■■ Waiver describes the abdication of a right under a contract. 4A JOHN C. MCBRIDE ET AL., GOVERNMENT CONTRACTS § 31.20[1], at 31–7 (1993). Express waiver involves the exchange of the relinquishment of a contract right for a defined consideration. *Teledyne Lewisburg v. United States,* 699 F.2d 1336, 1352 (Fed.Cir.1983). However, waiver may also occur by implication. *Roberts v. United States,* 174 Ct.Cl. 940, 953, 357 F.2d 938, 946 (1966); *Continental Oil Co. v. United States,* 83 Ct.Cl. 344, 353, 14 F.Supp. 533, 537–38 (1936), *cert. denied,* 299 U.S. 510, 57 S.Ct. 30, 81 L.Ed. 378 (1936); *Little Falls Knitting Mill Co. v. United States,* 44 Ct.Cl. 1, 17, 1908 WL 730 (1908). The Court of Claims has long recognized the application of waiver, either express or implied, to Government contracts. *Harvey Radio Laboratories, Inc. v. United States,* 126

Ct.Cl. 383, 391, 115 F.Supp. 444, 449 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954); *Industrial Uranium Co. v. United States*, 180 Ct.Cl. 50, 76, 376 F.2d 868, 876 (1967). Here, the plaintiff argues that the delegate of the contracting officer orally waived the writing requirement for additional work outside of the scope of the contract as well as the invoice writing requirement for overtime call-back services; thus, the plaintiff claims express waiver of these writing requirements. Alternatively, by failing to reaffirm these writing requirements during almost a decade of elevator maintenance, the plaintiff also contends that the GSA had implicitly waived the requirements; thus, the plaintiff also claims implied waiver of these writing requirements. As the plaintiff admits, this alternative argument finds legal foundation in the doctrine of estoppel.

■ In Government contracts, estoppel proscribes the Government from escaping liability for statements, actions, or inactions relied upon by another contracting party. ADMINISTRATION OF GOVERNMENT CONTRACTS, at 55. Estoppel thus prevents undue hardship to a contractor who has detrimentally relied upon an earlier inconsistent position of the Government. *National Medical Enters., Inc. v. United States*, 28 Fed.Cl. 540, 546 n. 2 (1993). Although the United States Supreme Court narrowed the scope of application of estoppel in *OPM v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 2470, 110 L.Ed.2d 387 (1990), the Court refused to deny application of the doctrine of equitable estoppel against the Government. Accordingly, the United States Court of Appeals for the Federal Circuit has noted the continuation of the doctrine. *Burnside–Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1579 (Fed.Cir.1993); *Brush v. OPM*, 982 F.2d 1554, 1561–64 (Fed.Cir.1992). Therefore, provided a party demonstrates some affirmative misconduct by the Government, the United States Court of Federal Claims also continues to recognize the doctrine. *Peters v. United States*, 28 Fed.Cl. 162, 169 (1993); *Howard v. United States*, 23 Cl.Ct. 432, 433–34 (1991). *See generally* John Cibinic, Jr., *Postscript: Estoppel*, 6 NASH & CIBINIC REP. ¶ 10, at 25–26 (1992); Ralph C. Nash, Jr.,

*Equitable Estoppel of the Government: An Argument That is Hanging by a Thread*, 5 NASH & CIBINIC REP. ¶ 7, at 20 (1992). Thus, as the plaintiff detrimentally relied on the nonadherence to the writing requirements for work outside of the scope of the Mart contract as well as for overtime call-back services, the plaintiff claims that the Government remains estopped from now escaping liability under either specific term of the contract.

While this Court finds the theories of waiver and estoppel persuasive in resolving the "change" question of this constructive change analysis, this Court finds that the most appropriate analysis of the instant issue relies not strictly on legal theories but also on contract interpretation. Indeed, whereas the "order/fault" component of the constructive change analysis relies strictly on legal theories, the "change component" relies primarily on matters of contract interpretation. ADMINISTRATION OF GOVERNMENT CONTRACTS, at 323. In the instant case, the plaintiff presents insufficient evidence to demonstrate an express waiver of the writing requirements, but based on the prior course of dealing with the Government, the plaintiff nevertheless presents a strong basis for an interpretation of the contract specifications requiring writings as inapplicable. In short, the plaintiff presents evidence of detrimental reliance based on an implied waiver of sections H(3) and G(2) of the Mart contract.

■ When a party claims the waiver of a contract specification or estoppel from the exact terms of a contract specification by detrimental reliance, as the plaintiff does here, Professor Cibinic names this argument the "constructive waiver of specifications." John Cibinic, Jr., *Constructive Waiver of Specifications: Coat of Many Colors*, 6 NASH & CIBINIC REP. ¶ 43, at 107 (1992). While the constructive waiver of specifications incorporates estoppel theories into the legal doctrine of waiver, the theory finds basis in any certain interpretation given to a contract specification by the contracting parties. Once the parties continue performance under the interpretation, one party may not later seek to enforce a contrary interpretation, even if the

former interpretation results in the constructive waiver of the contract specification. As Professor Cibinic explains, constructive waiver occurs where (1) the contracting officer possessed knowledge of the work outside the scope of the contract, (2) action or inaction by the contracting officer indicated the acceptance of nonspecification performance, (3) reliance ensued by the contractor on the action or inactions of the contracting officer, and (4) an inequity would result from a retraction of acceptance by the contracting officer. *Id.* at 107. Notably, acceptance of nonspecification performance may occur under either prior or concurrent contracts. *Id.* at 108–09. Based *both* on the prior and concurrent contracts for elevator maintenance at the Mart building, irrespective of the plaintiff's presentation solely on waiver and estoppel theories, this Court finds that the plaintiff in the instant case presents persuasive evidence of such a constructive waiver of specifications.

To demonstrate this type of waiver, Professor Cibinic points to *Gresham & Co. v. United States*, 200 Ct.Cl. 97, 470 F.2d 542 (1972). Therein, pursuant to a dishwashing machine contract, the contractor had delivered over 6,000 dishwashing machines under numerous contracts without a contractually required automatic detergent dispenser. When a Government auditor eventually discovered the discrepancy and mandated the installation of the dispensers on the dishwashers, the contractor complied but sought an equitable adjustment for the addition. When the contracting officer questioned the adjustment, the contractor argued that the Government had waived the requirement in the specifications. The Court of Claims agreed: "There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." *Id.* at 118, 470 F.2d at 554. Notably, the contracting officer also claimed lack of knowledge of the discrepancy, but the court rejected this excuse. The Court of Claims explained:

> The waiver of a contract provision requires a decision by a responsible officer assigned the function of overseeing the essentials of contract performance, not just

any Federal employee or officer whose work happens to be connected with the contract. Such a waiver by one with such authority will estop the Government. Assuming arguendo that the QAR representatives lacked the necessary authority, we think only one finding is possible: that the contracting officer knew or should have known of the situation, and that the authority was in his hands. If he did not know, he ought to have known, and knowledge is imputed to him.

*Id.* at 120, 470 F.2d at 555 (citations omitted). Thus, the court not only recognized that any authorized Government representative may waive contractual requirements, but the court also ruled that such authorization may occur either expressly or impliedly. The facts of the instant case present a similar situation.

In the case at bar, as for any work outside of the scope of the contract and overtime call-back services, the plaintiff explained that authorized Government representatives from the Mart building had repeatedly granted oral authorization for extra work under the instant contract as well as prior elevator maintenance contracts at the Mart building. In particular, the plaintiff alleged that the delegate of the contracting officer's representative (Mr. Sisk) had granted oral authorization for the majority of the work outside of the scope of the contract as well as the overtime call-back services, and Mr. Sisk confirmed this fact through testimony at trial. Based on these practices, the plaintiff presents evidence of a matter of contract interpretation, generally whether the Government waived the contractual writing requirements and specifically whether such waiver occurred by a prior course of dealing. Thus, this Court turns to the question whether the GSA waived the writing requirements of the Mart contract by a prior course of dealing.

A course of dealing describes "[a] sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RESTATEMENT

(SECOND) CONTRACTS § 223 at 157–58 (1981). If evidence reasonably demonstrates two contracting parties' intentions or common understanding of a contract, a prior course of dealing may establish an interpretation of a contract term. *Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl.Ct. 463, 470 (1984). Furthermore, although commonly used to resolve ambiguous language in a contract, "[t]here is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing." RESTATEMENT (SECOND) CONTRACTS § 223 comment b at 158. *Compare Boyd Int'l. Ltd. v. United States*, 10 Cl.Ct. 204, 206 (1986) (weighing prior course of conduct absent ambiguity) *with Troise v. United States*, 21 Cl.Ct. 48, 67 (1990) (considering prior course of conduct to resolve ambiguity). *See, e.g., United Food Servs., Inc. v. United States*, 19 Cl.Ct. 539, 549 (1990), *aff'd*, 928 F.2d 411 (Fed.Cir.1991); *Underground Constr. Co. v. United States*, 16 Cl.Ct. 60, 66 (1988). Here, in an absence of ambiguity, the primary issue involving the prior course of dealing concerns the contractual requirement for written authorization for work outside of the scope of the contract.

In the Mart contract, the course of dealing regarding work outside of the scope of the contract involved the submission of work tickets. According to the plaintiff, if the contractor issued a large work ticket, then the Government realized, by prior course of dealing, that the work required performance outside the scope of the contract. On the infrequent occasions where the elevator mechanic had no large ticket, the plaintiff testified that submission involved the smaller ticket but with an explanation that the work required performance outside the scope of the contract. Irrespective of the type of ticket, however, when the GSA received a work ticket, the delegate of the contracting officer's representative testified that he only signed those tickets for which he had authorized work. In fact, during testimony at trial, Mr. Sisk confirmed that, whenever any authorized representative of the GSA had requested extra work under the contract, he expected the performance of the work based solely upon oral authorization. The course of dealing regarding overtime call-back service followed the same informal procedures. Thus, because of the unique nature of the elevator maintenance requirements at the Mart building, Mr. Sisk had dispensed with the contractual requirement of written authorization for additional work and of written invoicing for overtime call-back services. For these reasons, this Court finds that, pursuant to an established course of dealing, the Government representatives at the Mart building had uniformly requested additional work and overtime call-back services with only oral authorization. Based on this finding, this Court determines the constructive waiver of the writing requirement of sections H(3) and G(2) of the Mart contract.

Despite the prior course of dealing regarding these writing requirements, the defendant contends that the submission of work tickets performed the sole purpose of recording proof of performance and not acceptance of work. While these tickets indeed performed this role pursuant to section H(2) of the Mart contract, the tickets also purportedly performed the additional role of signifying work considered within or outside of the scope of the contract. The defendant alleges, however, that no representative at the Mart building understood the distinction between the two tickets. The defendant further challenged the use of the large/small ticket distinction as confusing, because the small tickets contained language indicating the need for additional work (a function the plaintiff intended for the large ticket). The small tickets stated: "Your elevator was serviced today & we recommend the following work on your elevator." The tickets also suggested: "Please give the above your immediate attention and notify us if you wish this work done." As noted above, in contrast to the arguments either of the plaintiff or the defendant, this Court finds the utilization of the large and small tickets as inapposite regarding extra work pursuant to the prior course of dealing for the Mart contract. Thus, despite the use of either the large or small ticket, the evidence persuasively demonstrates that Miller repeatedly approached Government representatives regarding extra

work as well as additional overtime call-back service and obtained oral authorization for such work. Due to the consistent nature of the additional repair and maintenance requirements caused by the renovation of the Mart building, pursuant to a clear course of dealing, this Court thus finds that the plaintiff made sufficient adherence to the terms of the contract irrespective of the writing requirements. For each major repair, the plaintiff obtained oral authorization from Mr. Sisk and performed the work accordingly. For the additional maintenance requirements and miscellaneous repairs, moreover, this Court finds the evidence presents ample demonstration of an informal system of oral approvals followed by the presentation of (generally) large work tickets. Based on this system, this Court infers the knowledge of the Government representatives through prior course of dealing and thus finds a constructive waiver of specifications as to the writing requirements at issue.

Therefore, notwithstanding the importance of the foregoing contractual requirements, this Court finds that the Government had waived the requirements of sections H(3) and G(2) of the Mart contract requiring the written authorization of the contracting officer for additional work considered outside of the scope of the contract and written invoicing for overtime call-back services. Therefore, pursuant to the constructive waiver of specifications, as based on a prior course of dealing, this Court finds the Government estopped from escaping liability for the constructive changes to the instant contract. Accordingly, this Court finds the "change" component of the constructive change doctrine satisfied.

### 2. Lack of Authority

Because the plaintiff failed to secure definite authorization for additional work from the contracting officer, the defendant also rejects any authority for a "change/order" to the Mart contract. Specifically, the defendant contends that the plaintiff never secured adequate authorization from the contracting officer for the extra repairs and additional maintenance as required by the Mart contract. While the plaintiff disputes none of the defendant's claims regarding the lack of authorization from the contracting officer, the plaintiff argues that authorization had been granted by other authorized Government representatives with independent contracting authority.

The Mart contract expressly provides that only the contracting officer may amend, modify, or deviate from the contract terms. The contract states:

> The contracting officer has the overall responsibility for the administration of this contract. He alone, without delegation, is authorized to take actions on behalf of the Government to amend, modify or deviate from the contract terms conditions, requirements, specifications, details, and/or delivery schedules. However, he may delegate certain other responsibilities to his authorized representatives.

Mart Contract § E(1)(A) at 13. Relying on section E(1)(A), both the defendant and the contracting officer emphasized at trial that only the contracting officer maintained the authority to authorize work outside of the scope of the Mart contract.

Pursuant to the requirement of section E(1)(A) for the authorization of the contracting officer for additional work outside the scope of the Mart contract, this Court considers the trial testimony of the contracting officer. The contract named Mr. Carl Harper, who was stationed in Kansas City, Missouri, as the contracting officer, but this Court found that Mr. Harper was wholly uninformed about the circumstances surrounding the renovation of the Mart building in St. Louis, the conditions of the Mart building during the mobilization, demolition, and renovation phases, or the exigencies of contract performance throughout this period. As such, this Court found the testimony of Mr. Harper unpersuasive. Indeed, Mr. Harper had not even known of the difficulties faced by Miller in performing the Mart contract until the filing of the first claim for an equitable adjustment. Furthermore, Mr. Harper presented testimony during trial that this Court found not only unreasonable but outrageous. For example, when questioned about the requirement of section E(1)(A) for

the authorization of the contracting officer, Mr. Harper testified:

> Q Now, Miller takes the position that on [March 7, 1988], that was work outside of the contract. Is it your contention that none of that work should have been done until they got a written approval, is that right? Prior written approval?
>
> A If it's outside the scope of the contract, that's correct.
>
> Q So on March 7, then, they should have shut down the number two and four elevators, remained shut down while it took three days to process the written approval. Is that your position?
>
> A Yes, sir.
>
> Q On the next day, March 8, elevators one and three went out of service, right?
>
> A Yes, sir.
>
> Q It's your position that they should have left those shut down until the prior written approval was processed?
>
> A Correct.
>
> Q Fine, so now we have shut down elevators one, two, three and four. * * *
>
> * * * * * *
>
> So we had one elevator to operate, is that your position, that Miller should have left this building in a position that out of the five passenger elevators, there was only one that operated? The other four were shut down, even though we could fix them and get them into service in a matter of a couple of hours, until we process this paper four three days?
>
> A If he expected to get paid for work, yes, sir.

Transcript, at 453–54. In the foregoing scenario, the Assistant Field Office Manager had authorized work outside the scope of the Mart contract pursuant to the exigencies of the situation, and by denying compensation, Mr. Harper displayed complete disregard for the requirements of a federal office building. On another matter, Mr. Harper testified that the Government maintained no obligation to compensate Miller for an elevator during the period of repair. In effect, Mr. Harper considered a pro rata reduction in price proper during periods of maintenance or repair. As

evidenced above, during his testimony at trial, Mr. Harper displayed a complete lack of common sense or practicality regarding elevator and building management. These deficiencies extended to the application of section E(1)(A). For, even though the contracting officer was located in Kansas City and administered over 100 similar contracts, even though the contracting officer admitted a typical three-day delay for approval for additional work, and even though the plaintiff recited over 120 instances of such work on the Mart contract, the contracting officer steadfastly emphasized at trial that he alone maintained the authority to authorize work outside of the scope of the contact. Based on the facts of this case, and as described below, this Court finds the contracting officer's position as incredible and thus untenable.

In addition to the foregoing provision designating the role of the contracting officer, the Mart contract further states that the contracting officer had delegated certain authority to the contracting officer's representative (COR). The contract specifies:

Contracting Officer's Representative:

Mr. John Martin

Room 113, Federal Building

405 S. Tucker Boulevard

St. Louis, Missouri

Telephone: (314) 263–0305

is designated as the contracting officer's representative to assist him in the discharge of his responsibilities when he is unable to be directly in touch with the contract work. The responsibilities of the contracting officer's representative include, but are not limited to: determining the adequacy of performance by the contractor in accordance with the terms and conditions of this contract; acting as the Government's representative in charge of work at the site; ensuring compliance with contract requirements insofar as the work is concerned; and advising the contracting officer of any factors which may cause delay in performance of the work.

Mart Contract § E(1)(B) at 13. While Mr. Martin held the position of Field Office Manager for the Mart building, Mr. Martin also maintained the position of the COR under

the Mart contract. The significance of these dual roles comes in question, however, upon review of Mr. Martin's relationship with the day-to-day operations of the Mart building. At the time of the performance of this contract, Mr. Martin maintained responsibilities for several buildings in the St. Louis area and not just for the elevator maintenance requirements. As a result of the varied job responsibilities, as admitted at trial, Mr. Martin had delegated his authority as a COR under the Mart contract to the Assistant Field Office Manager for the Mart building, Mr. Michael Sisk. Indeed, as Mr. Harper testified at trial, just as Mr. Harper had delegated authority as the contracting officer to Mr. Martin for the Mart contract, Mr. Harper further considered that this delegation extended to Mr. Sisk as well. Therefore, at least with regard to the Mart contract, except apparently for the specific contract exclusion for modifications, Mr. Harper and Mr. Martin had delegated all responsibilities to Mr. Sisk.

The issue remains whether Mr. Sisk, despite the specific contract exclusion, maintained authority to approve additional work outside of the scope of the contract. Citing to section E(1)(A) regarding the contracting officer and section E(1)(B) regarding the COR, the Government strenuously contends that neither the contracting officer, Mr. Harper, nor the COR, Mr. Martin, had approved the work claimed by Miller in the instant case. To provide legal foundation, the defendant cites a series of Court of Claims cases describing the importance of Government direction and Government authority for work outside the scope of the contract. *See, e.g.,* *Virginia Elecs. Co. v. United States,* 221 Ct.Cl. 962, 618 F.2d 124 (1979); *Bristol & Martin, Inc. v. United States,* 125 Ct.Cl. 4, 110 F.Supp. 262 (1953). These cases, however, assume either the lack of direction for the work or the lack of authorization for any work directed. To the contrary, albeit inadvertently, the plaintiff presents persuasive evidence of implied authority for all the work required by the GSA. Significantly, the Government neither denies that representatives of the GSA requested the additional work at issue nor presents any objections as to the quality of performance of the extra work

required by the renovation, but argues only that neither the GSA nor the contracting officer had granted authority to any Government representatives to request the additional work performed.

While admitting an absence of actual authority from the contracting officer under the explicit terms of the contract, the plaintiff proffers the authorization granted by other authorized Government representatives to satisfy the authority question. As for the contractually specified representatives of the GSA under the Mart contract (the contracting officer and the COR), the plaintiff argues that the actions of neither Mr. Harper nor Mr. Martin engaged a direct role in the day-to-day issues regarding the performance of the Mart contract. The plaintiff argues, instead, that the authority for the work almost always came from the Assistant Field Office Manager, Mr. Sisk. Yet, the plaintiff argues not that Mr. Sisk authorized additional work under the Mart contract as a delegate of the COR (thus, by implied authority), but that Mr. Sisk authorized additional work within his own authority as a warranted contracting officer to obligate the Government for contractual amounts up to $25,000 (thus, by actual authority).

The defendant admits that Mr. Sisk had authorized both additional repairs and additional maintenance outside of the scope of the contract at the Mart building. However, as part of the admission, the defendant emphasized that Mr. Sisk only maintained the authority to obligate the Government for sums less than $1,000 (later increased to $2,000) without conducting competitive bidding. The defendant explains:

[O]n numerous occasions during contract performance, Miller's mechanics would come to Mike Sisk, the Assistant Field Officer [sic] Manager for the Federal Mart Building field office, and ask him to look at something that they believed was outside the scope of the Miller contract. Often, these requests would involve issues regarding extra dust and debris in the elevator areas. If Mr. Sisk agreed it was extra work outside the scope of the contract, he would request a price to perform the work from Miller, accept or reject the price, and,

if the price was accepted, give Miller approval to perform the work. He would provide Miller with extra compensation for the work in his actual authority pursuant to his contracting officer's warrant of authority, which authorized him to make purchases of up to $1,000 without obtaining competitive bids. * * * Miller followed this procedure *very* frequently and was well aware of the process that they were to follow to have work priced at less than $1,000 and outside the scope of the contract approved. This extra work did not constitute a modification to the Miller contract, but was awarded as a separate contract within Mr. Sisk's authority as a contracting officer.

Defendant's Post–Trial Brief and Proposed Findings of Fact, at 6–7. While the defendant correctly points out that Mr. Sisk had authorized additional maintenance and repair work within his capacity as a contracting officer, the defendant implies that Miller knew the difference in Mr. Sisk's approval of work under his own contracting authority and Mr. Sisk's approval of work under the Mart contract. The evidence does not support this supposition. Instead, the facts adduced at trial demonstrate a system where Mr. Sisk orally ordered the work and the plaintiff complied with such orders, irrespective of the source of authority. At trial, Mr. Sisk testified:

Q In your experience, sir, is it your belief that when the government told Miller, or had a discussion with Miller, and found out from them orally, this is exactly what's wrong, and you, as a representative government said, okay, go ahead and fix it, that Miller was entitled to rely on your word?

A Yes, sir.

Q Is it your position, then, that even though the contract said there should be written notices and prior written authorizations, if the government itself said, orally, do it, there's no question that that's true, and that the work was done, the government should pay for it, is that your position?

A Yes.

Q I think we're in complete agreement. In fact, as a practical matter, Mr. Sisk, it's not practically possible to get prior written authorizations out of Kansas City for each and everything that has to be done on a job site, isn't that true?

A Yes.

Q If you did, you'd never get a job done, would you?

A It would be hard.

Transcript, at 603–04. As evidenced above, this Court finds that Mr. Sisk performed the role of a responsible Assistant Field Office Manager who required the repair of elevators on a timely basis for the convenience of the public and for the federal office personnel working within the building. Mr. Sisk obviously understood the unique circumstances faced by Miller in maintaining the elevator systems at the Mart building and strived to cooperate with Miller in contending with the difficult building conditions. In the performance of these duties, however, Mr. Sisk gave reason for the belief that he maintained authority to approve modifications to the terms of the Mart contract. As a result, in contrast to the plaintiff's proffers of actual authority, this Court finds ample evidence of implied authority to approve work outside the scope of the contract.

 As a general matter, the Government remains bound only by the words or actions of those possessed with authority to bind the Government. RALPH C. NASH, JR. & JOHN CIBINIC, JR., FORMATION OF GOVERNMENT CONTRACTS 64 (2d ed. 1986). Thus, generally, only actual authority binds the Government: mere appearances of authority present no basis for liability because apparent authority is not applicable to Government contracts. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Implied authority, however, also binds the Government. *Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 87, 98 F.Supp. 757, 766, *cert. denied*, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951). Implied authority binds the Government where a Government representative without actual authority exercises an integral part of the duties assigned to that Government employee. *H. Landau & Co. v. United States*, 886

F.2d 322, 324 (Fed.Cir.1989) (quoting RALPH C. NASH, JR. & JOHN CIBINIC, JR., FORMATION OF GOVERNMENT CONTRACTS 43 (1982)). If a question of authority arises, whether express or implied, then the plaintiff bears the burden of proof. *Kania v. United States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Consortium Venture Corp. v. United States,* 5 Cl.Ct. 47, 49 (1984), *aff'd,* 765 F.2d 163 (Fed.Cir.1985). Here, albeit without realizing such, the plaintiff presents evidence of implied authority, particularly in view of the express delegation of authority from the COR.

Therefore, despite the plaintiff's singular authority argument of authorization by independent contracting authority, this Court finds that Mr. Sisk not only authorized work for sums less than $2,000 within his own independent contracting authority as a contracting officer, thus by express authority, but also authorized extra work under the Mart contract in his capacity as the delegate of the COR, thus by implied authority. Under this latter type of authority, this Court finds the Government liable for the majority of claims made by the plaintiff.

Delegation of authority generally relies upon that authority specifically designated by a contracting officer. The Federal Acquisition Regulation (FAR) provides explicit authority for a contracting officer to make such delegations to "authorized representatives." *See* FAR 2.101, 48 C.F.R. § 2.101 (1992) ("*Contracting officer* means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the contracting officer acting within the limits of their authority as delegated by the contracting officer."). Such delegation may include a delegation of authority to modify the terms of a contract. *Centre Mfg. Co. v. United States,* 183 Ct.Cl. 115, 126, 392 F.2d 229, 235 (1968). *See WRB Corp. v. United States,* 183 Ct.Cl. 409, 420 (1968) ("The objection must be directed to the contracting officer (*or his authorized representative*) because, by the agreement of the parties embodied in that provision, he is only person

with the prerogative to alter the contractual requirements.") (emphasis added). In some instances, either statutory or regulatory prohibitions exist to proscribe the scope of delegation of certain types of authority. *See, e.g., Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 445 (1990); *Planning Research Corp. v. United States,* 4 Cl.Ct. 283, 290 (1983). In the case at bar, however, while the contract provides a contractual prohibition on the delegation of authority to modify the terms of the contract, "implied authority" nevertheless provides an avenue whereby the plaintiff may demonstrate whether another Government representative possesses the requisite of authority to modify the terms of the contract. *See Zoubi v. United States,* 25 Cl.Ct. 581, 587 (1992) (imputing an Acting Program Director with implied authority to bind the Government).

In the case at bar, while Mr. Harper constituted the formally designated contracting officer, and Mr. Martin constituted the formally designated COR, as the delegate of Mr. Harper and Mr. Martin, Mr. Sisk performed the functions of an informally (impliedly) designated contracting officer. Mr. Sisk repeatedly approved additional repair and extra maintenance work in seeming conformity with the explicit provision of section E(1)(A) which allows only the contracting officer to authorize such work. In *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 87, 98 F.Supp. 757, 766 (1951), the Court of Claims recognized how a Government representative with contracting authority may, through implied authority, realize the authority to modify the terms of a contract: "In general, an officer authorized to make a contract for the United States has the implied authority thereafter to modify the provisions of that contract particularly where it is clearly in the interests of the United States to do so." Here, the Assistant Field Office Manager represented that "officer authorized to make a contract for the United States." Thus, with some actual authority, as an authorized contracting officer by implied authority, Mr. Sisk's scope of authority expanded to the acceptance of work outside the scope of the contract. *See California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27 (1990) ("[A] person with some

limited actual authority impliedly may have broader authority."), *aff'd,* 937 F.2d 624 (Fed. Cir.1991). As such, in the unique circumstances of this case, this Court concludes that the plaintiff had received the requisite authority for the additional work performed in conformity with section E(1)(A) of the Mart contract.

Despite the delegation of authority from the contracting officer to the COR and then from the COR to the Assistant Field Office Manager at the Mart building and the subsequent incurrence of implied authority to modify the terms of the contract, the defendant contends that subsequent documents delivered to the plaintiff had reestablished the importance of section E(1)(A) regarding the exclusive authority of the contracting officer to authorize work outside the scope of the contract. To evidence this position, the defendant points to three documents which instructed the plaintiff on the prerequisites of authorization from the contracting officer. The GSA transmitted two of these three documents to the plaintiff, however, well after the performance of most of the work at issue, one on August 3, 1988 and another on November 21, 1988. The third document, transmitted on January 27, 1989, responded to an invoice request. Yet, although the document reiterated the requirement of prior authorization by the contracting officer, the GSA nevertheless paid the invoice. Typical of the three documents, the August 3 document reads:

> This letter will serve as a revision to subject memorandum dated 2/16/88. The following procedures have been set up for responding to calls for elevator maintenance.
>
> 1. The only personnel from GSA authorized to place a call for service are:
>
> | | |
> |---|---|
> | John E. Martin | Michael Ellison |
> | Michael E. Sisk | A.J. Heath |
> | Ralph D. Cole | Hosea Fletcher |
> | Toney S. Findley | Leroy Anderson |
> | | (Our Law Enforcement |
> | | Branch Personnel) |
>
> 2. Miller personnel *must* sign in at this office upon arrival and sign out when leaving on the appropriate sign-in/sign-out log. After normal duty hours, sign-in/sign-out logs are located at the FPS Guard Desk at the entrance to the building.
>
> 3. Anything the service man finds wrong that is not within the scope of the contract *must* be brought to our attention. No work may be started without issuance of a purchase order signed by either Michael Sisk or myself.
>
> 4. Work tickets *must* be signed by a GSA authorized employee. In the event an authorized signature cannot be obtained (i.e. after hours work [sic, after work hours]) a copy of the work ticket *must* be left with the sign-in/sign-out log upon departing the building.

Memorandum from John E. Martin, Field Office Manager, PBS, GSA, to Miller Elevator Company (August 3, 1988). As for item one, the defendant presents no evidence that unauthorized Government personnel placed service calls for elevator repair or maintenance. As for items two and four, the memorandum requires sign-in and sign-out and the transmittal of a work ticket, but as established at trial, Miller's elevator mechanics often found the guard desk empty after normal working hours. Unable to conform with these requirements, and specifically the sign-out requirement, the mechanics simply slipped the work ticket under the door. Finally, as for item four, the record presents ample evidence that Mr. Sisk continued to require work without written authorization, even after the transmittal of these documents. Therefore, despite these three documents, the GSA continued to allow extra work under the direction of Mr. Sisk.

██ Assuming arguendo the absence of implied authority for the additional repairs and maintenance at issue, this Court nonetheless finds the Government liable for an equitable adjustment by ratification. *See* FAR 1.602–3, 48 C.F.R. § 1.602–3 (1992) (defining the bona fides of ratification by the Government). *See, e.g., Handel v. United States,* 16 Cl.Ct. 70, 74 (1988); *Crane v. United States,* 44 Ct.Cl. 324, 359, 1908 WL 749 (1909), *aff'd,* 222 U.S. 88, 32 S.Ct. 33, 56 L.Ed. 106 (1911). At trial, the plaintiff explained that the contracting officer had fre-

quently approved repairs and other maintenance work outside of the scope of the contract without requiring adherence to the contract provision requiring contracting officer approval (or even the writing requirement described in the preceding section). When the plaintiff submitted "extra work tickets," the Government customarily approved and paid the bills, at least until the incurrence of the major repair on passenger elevator No. 3. Based on these actions, and as the defendant never reasserted the contract specification requiring the authorization of the contracting officer for additional work after the initiation of renovation (see next section for defendant's argument here), this Court further finds the Government liable for the extra work by ratification.

■■■ In addition to the foregoing analysis of authority, this Court also finds the Government liable for the additional work at issue pursuant to the emergency circumstances during the mobilization, demolition, and renovation activities at the Mart building. As the parties to this suit admitted at trial, toward the end of the term of the instant contract, the elevators required daily maintenance services. The scope of the work thus required under the contract clearly exceeded that anticipated by either party. In similar circumstances, other tribunals have recognized the relevance of "emergency circumstances" with regard to the normal requirements of authority. For instance, the Armed Services Board of Contract Appeals has recognized a certain latitude for authority questions in cases involving "expeditious action." In *Urban Pathfinders, Inc.*, ASBCA No. 23,134, 79–1 BCA ¶ 13,709, 1979 WL 2513, the ASBCA considered a contractor claim involving additional work authorized by a project officer but without the authorization of the contracting officer. In consideration of the authority question, the board ruled:

[The project officer] was the key Government person with regard to the performance of the contract. We are not unmindful of the fact that the contracting officer did not delegate the authority to him to change the terms of the contract but we conclude that his delegated authori-

ty was sufficiently broad to include the authority to change the terms of the contract in a situation where expeditious action was required to avoid a frustration in the objectives for which the contract was awarded. We find, therefore, that, under the circumstances of this case, the Project Officer had the implied authority to order the additional work for which appellant claims compensation.

*Id.* at 67,260. This Court finds the instant case quite similar to the ASBCA case, except perhaps that the exigencies of the instant case far exceed those in *Urban Pathfinders*. In that case, an unauthorized Government representative requested the assistance of a moving consulting service in physically transporting furniture and conducting other transportation services during the move from one building to another. In the instant case, however, an authorized Government representative of the COR requested additional repairs and maintenance work for a federal office building during renovation. Therefore, based on the concerns of public safety and public convenience, this Court also finds the Government liable for the additional work ordered by the Assistant Field Office Manager based on this authorized Government representative's "expeditious actions" during "emergency circumstances."

Therefore, notwithstanding the importance of the foregoing contract requirements, this Court finds that the Government accepted the work at issue by either the express authority of a Government representative with actual contracting authority, the implied authority of the same Government representative with delegated authority to acts as the contracting officer, or by ratification. Alternatively, this Court also finds the Government liable for the costs at issue pursuant to the emergency circumstances created by the mobilization, demolition, and renovation of this federal office building. Accordingly, this Court finds that the plaintiff satisfies the "order/change" component of a constructive change.

3. Inadequate Adherence to the Contract Terms

■■■ In the foregoing sections, this Court concludes that the plaintiff establishes both

the "change" component as well as the "order/fault" component of a constructive change. Nevertheless, even had the plaintiff obtained written authorization for the work at issue, and even had the plaintiff obtained the requisite authority for the additional work, the defendant nevertheless rejects plaintiff's entitlement to additional compensation. Thus, even upon a finding of a constructive change, the defendant presents this final argument based on the plaintiff's apparent failure to adhere to the contractual requirements. As inferred in the analysis on nondisclosure of superior knowledge, the defendant likewise presents this argument as a defense to that claim as well.

The Mart contract contains specific procedural requirements for the performance of elevator maintenance and call-back services at the Mart building. The contract states:

The contractor shall instruct his personnel that any time they perform work under this contract, they shall comply with the following procedures:

(1) Contact the Field Office Manager or his representative when first arriving at the building(s), and sign in log maintained for this purpose.

(2) If the work is of a continuing nature, a check-in visit will be required each day, and sign in is required each day.

(3) At the completion of the work the contractor's employee(s) shall turn in to the Field Office Manager or his authorized representative a copy of a work order, repair order or a form which furnish the following information:

(a) Name and address of the contractor.

(b) Name of the contractor's employee in charge of the work.

(c) Date(s) work performed.

(d) Brief description of work performed including equipment identification.

(e) If routine maintenance was performed, specify equipment and type of maintenance performed on the equipment.

(f) Signature of contractor's employee and signature block for Field Office Manager or his authorized representative.

Mart Contract § H(2)(A) at 17. Referencing the requirements of section H(2)(A), the defendant rejects liability for the additional work performed by the plaintiff as not in conformity with the contractual requirements. Specifically, the defendant claims that the plaintiff failed to adhere to the sign-in/sign-out requirement of section H(2)(A)(1–2), the job ticket submission requirement of section H(2)(A)(3), and the informational requirement of section H(2)(A)(3)(a-f).

Pursuant to section H(2)(A)(1–2), while the defendant criticized the plaintiff's failure to adhere to the proper sign-in/sign-out requirements with the Field Office Manager personnel, the defendant admitted that these personnel occupied the Mart building only during normal working hours (generally, from 8 a.m. to 5 p.m.). After those hours, the GSA had directed the mechanics from Miller to sign out at the security desk, but the plaintiff successfully established at trial that the security office was occasionally vacant when Miller's mechanics completed a job. In fact, on such occasions, the GSA had instructed the mechanics to deposit the job ticket with the security office after the completion of a job by "slipping the ticket under the door." The GSA provided no alternative for the sign-out requirement, however. In consideration of these practices, this Court finds that GSA had waived explicit adherence to section H(2)(A)(1–2) of the Mart contract.

Similarly, the same unique circumstances apply to the job ticket submission requirement of section H(2)(A)(3). This section required that the elevator maintenance contractor deposit a job ticket with the Field Office Manager personnel upon completion of the work, but as noted above, time limitations made compliance with this contractual provision difficult. Despite the custom and practice of "slipping the ticket under the door," the defendant nevertheless presented evidence at trial to challenge the plaintiff's computation of labor hours based on a failure of proof as to job tickets. Citing the 825 hours claimed by the plaintiff, the defendant noted that GSA personnel had only "signed off on" (i.e., certified receipt of the tickets by signature) 282 hours. The defendant thus argues that, as all hours in excess of 282

labor hours are unverifiable, that the plaintiff fails the burden of proof to evidence the completion of work in excess of this amount. This Court finds the defendant's position as erroneous. As explained at trial, the analysis of the labor hours only included hours as verifiable if both a time ticket and a sign-in/sign-out record existed. The analysis included no comparison of tickets to the recorded hours for sign-in and no identification of sign-in hours absent a corresponding sign-out record. In view of the custom and practice established on sign-out records as well as the deposit of work tickets, the absence of analysis in view of this prior course of dealing constitutes error. Once the GSA allowed the submission of job tickets by the insecure "under the door" method, the Government may not now disclaim the uncertain results of that decision based on the lack of verifiability. As the defendant even concedes, for the one verifiable item of sign-in recordations, the plaintiff had always signed in and the job tickets correspond to the sign-in logs. Therefore, this Court also finds that GSA had waived explicit adherence to the job ticket submission requirement of section H(2)(A)(3) of the Mart contract.

In contrast to the submission requirement of sections H(2)(A) and H(2)(A)(3), the informational requirements of section H(2)(A)(3)(a–f) involve questions not of submission but of completion. When the plaintiff submitted work tickets pursuant to section H(2)(A)(3), section H(2)(A)(3)(a–f) required that these tickets contain six specific informational requirements. Upon a review of the work tickets submitted by the plaintiff, the defendant notes the following particular defects: the failure to describe the work performed per section H(2)(A)(3)(d) and the failure to identify the elevator on which work occurred as well as the failure to note whether the work included work other than routine maintenance per section H(2)(A)(3)(e). In the testimony before this Court, several of the plaintiff's witnesses noted the difficulty in persuading elevator mechanics to properly describe the work as required by the contract. In one instance, a witness (a mechanic himself) admitted that "it was not the mindset of these men" to comply with the writing requirements of Government contracts. If the plaintiff hoped to persuade this Court with such references, it failed. Despite the circumstance of any individual who contracts with the Government, if the contract requires a particular course of action, then generally that course constitutes a condition precedent to proper performance of that contract. If the contract requires completion of particular documents for payment, then payment may be withheld until the delivery of such forms. Here, however, the facts show a difference case. For, if the Government continuously allows a contractor to submit technically defective documents, then at some point, the Government waives the right to require the contractually required documents. This Court finds that, at some point during the almost twelve-year performance history between the parties to this and previous elevator maintenance contracts, the Government waived the requirement of strict compliance with the technical informational requirements of section H(2)(A)(3)(a-f).

Disparate from the constructive waiver of specifications, which this Court applied to the writing requirements of sections H(3) and G(2) of the Mart contract (earlier in this Opinion), this Court renders the foregoing three sections of the contract waived pursuant strictly to normal waiver. *See Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 88, 98 F.Supp. 757, 766, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951) ("When the Government is acting in its proprietary capacity, its representative has authority to waive or modify a provision in a Government contract, and the Government may be estopped by such act of waiver in the same manner as a private contractor."). Similarly, disparate from the finding of implied authority for the approval of work outside the scope of the contract (earlier in this Opinion), this Court finds the implicit waiver of these three sections of the contract by the contracting officer. From the inception of this contract, as well as under previous contracts between the parties to this suit, the Government had repeatedly accepted the work tickets submitted by the plaintiff as adequate proof of completion of the work and paid the plaintiff based on those tickets. Now, only because the work at issue consti-

tutes work considered outside of the scope of the contract (or pursuant to a nondisclosure of superior knowledge), the defendant seeks to change the rules of the game. To the contrary, this Court finds the defendant estopped from challenging here what the Government had always allowed before.

Thus, this Court finds that the Government waived the requirements of sections H(2)(A)(1–2), H(2)(A)(3), and H(2)(A)(3)(a–f) of the contract pursuant to simple waiver.

 Alternatively, even if the Government had waived the foregoing requirements, the defendant argues that the plaintiff failed to provide adequate notice of the additional work. The changes clause of the Mart contract specifies: "The Contractor must submit any 'proposal for adjustment' * * * under this clause within 30 days from the date of receipt of the written order." Mart Contract, Changes Clause (citing FAR 52.243–1(c), 48 C.F.R. § 52.243–1(c) (1984)). For claims of constructive change particularly, the notice requirement comprises an important element of the analysis. ADMINISTRATION OF GOVERNMENT CONTRACTS, at 358–49. In *Mega Constr. Co. v. United States*, 29 Fed.Cl. 396 (1993), the Court of Federal Claims recently identified the notice requirement as follows:

> [A]ny claim for equitable adjustment must be provided by the contractor within thirty days from receipt of any written change order or written notice of a constructive change. The contractor must set forth, in writing, the general nature and monetary extent of the claim. The government has discretion to receive any claim asserted under this clause prior to final payment. The consequences of a contractor's failure to follow the notice provisions of the clause may result in its claim being disallowed.

*Id.* at 443. Nevertheless, absent a showing of prejudice to the Government, the thirty day notice requirement for a constructive change has not been strictly enforced. *W.H. Armstrong & Co. v. United States*, 98 Ct.Cl. 519, 530, 1943 WL 4254 (1943); *Calfon Constr. Inc. v. United States*, 18 Cl.Ct. 426, 438 (1989), *aff'd*, 923 F.2d 872 (Fed.Cir.1990). Moreover, if a contracting officer maintains actual or constructive knowledge of the con-

ditions which caused the constructive change to the contract, in most cases, no prejudice to the Government occurs. *See Shepherd Co. v. United States*, 125 Ct.Cl. 724, 733, 113 F.Supp. 648, 652 (1953) ("Since the contracting officer had been immediately apprised of the conditions, he at any time could have determined whether they differed from those shown on the plans and specifications, or were of an unusual nature differing materially from those ordinarily encountered."); *see also Hoel–Steffen Constr. Co. v. United States*, 197 Ct.Cl. 561, 573, 456 F.2d 760, 768 (1972) ("[N]otice provisions in contract-adjustment clauses [should] not be applied too technically or illiberally where the Government is quite aware of the operative facts."). Furthermore, if the contractor notifies the Government of the constructive change before final payment, an inference of no prejudice arises. *Jo–Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 156–57, 535 F.2d 62, 66 (1976); *Gulf & Western Industries, Inc. v. United States*, 6 Cl.Ct. 742, 749 (1984). The burden of proving otherwise lies with the Government. *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 303 (1988); *H.H.O. Co. v. United States*, 12 Cl.Ct. 147, 163 (1987). As the plaintiff notified the Government of the constructive change before final payment, and as the defendant makes no showing of prejudice to rebut the inference, this Court finds no prejudice in the plaintiff's failure to notify the contracting officer of the claim for additional work within a thirty-day time period.

Nevertheless, even absent waiver of the contractual provisions, or even assuming arguendo prejudice by inadequate notice, the majority of the extra work performed by the plaintiff constituted work under almost emergency circumstances, and this Court herein finds special dispensation therefor. As the foregoing analysis permits a contractor claim without the requisite authority under emergency circumstances, if the contractual requirements of the instant contract prevent recovery of the type of good faith performance described in this Opinion, this Court finds a similar rationale applicable for a recovery by the plaintiff based on the atypical elevator conditions at the Mart building. In-

deed, both the plaintiff and the defendant refer to numerous emergency-like conditions throughout the renovation process. In some instances, persons became trapped on the elevators because of failures caused by the demolition activities. In other instances, so many elevators became inoperable that immediate repair became necessary: on at least one occasion, only one elevator operated to serve all of the federal workers in the six-story building. In yet another instance later in the term of the contract, the dust and debris required daily maintenance to satisfy safety requirements. For such occasions, as confirmed by the Assistant Field Office Manager, the GSA maintained funds for emergency situations, and Mr. Sisk confirmed that the examples such as those cited above could have represented requisite "emergencies." Under these circumstances, when Mr. Sisk contacted Miller requesting a repair, he wanted immediate repair without strict compliance with all the formalities of the contract. When Miller timely performed the required repairs, Mr. Sisk further anticipated payment for the extra work without reference to the particular contract requirements. Therefore, even if these situations arose outside of the scope of the Mart contract, and even if they contrasted with the type of emergencies under the GSA emergency fund, they nevertheless comprise the bona fides of implied-in-fact contracts.

In the absence of an express contract, the Court of Federal Claims and its predecessor courts have long recognized contracts as implied-in-fact where mutuality of intent to contract and the exchange of consideration occurs coterminous between a private person and an authorized representative of the Government. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). In contrast with an express contract which includes an express exchange of offer, acceptance, and consideration, an implied-in-fact contract arises by inference. *El Centro v. United States*, 922 F.2d 816, 821 (Fed.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *OAO Corp. v. United States*, 17 Cl.Ct. 91, 99 (1989). *See, e.g., Klebe v. United States*, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244 (1923) ("A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications."); *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923) ("[A]n agreement "implied in fact,' founded upon a meeting of minds, * * * is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."). Further, although a party demonstrates an implied-in-fact contract by circumstantial evidence, in contrast to proof of an express contract by direct evidence, the inference still requires proof of all the elements of a contract. *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 458 (1987). As an additional refinement, proof of an implied-in-fact contract requires explicit authority for the conduct of the Government representative. *Alexandria v. United States*, 737 F.2d 1022, 1027 (Fed.Cir.1984). Absent such authority, irrespective of the equities, an implied-in-fact contract remains untenable. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Yet, provided the authority exists, even an oral agreement gives rise to an implied-in-fact contract. *New American Shipbuilders Inc. v. United States*, 871 F.2d 1077, 1080 (Fed.Cir.1989). In the case at bar, the plaintiff obtained the oral authorization of an authorized Government representative for the additional work at issue. Further, as adduced at trial and as set forth in detail in the preceding sections, this Court finds that the parties possessed the requisite mental intent for establishing an implied-in-fact contract. Therefore, notwithstanding the above recited legal arguments and defenses, this Court finds the defendant liable for the extra costs incurred by the plaintiff as recited in the claims for the heretofore referenced nondisclosure of superior knowledge and constructive change.

In summary, based on waiver, this Court finds that the Government disclaimed any defense based on sections H(2)(A)(1–2), H(2)(A)(3), or H(2)(A)(3)(a-f) of the Mart contract. Similarly, based on the submission of a claim to the contracting officer before final

payment, this Court further finds no prejudice for the plaintiff's failure to provide notice of additional costs to the Government within the thirty-day contractual period. Then, only assuming arguendo the absence of waiver of these contractual requirements or otherwise improper notice, this Court nevertheless finds the defendant liable to the plaintiff based on a theory of implied-in-fact contract.

For the foregoing reasons, this Court finds that the defendant fails to establish either of the three defenses proffered to rebut the plaintiff's showing of a constructive change. Despite the defendant's proffer of a writing requirement, based on a constructive, waiver of specifications, the plaintiff establishes the "change" component of a constructive change. Despite the defendant's proffer of lack of authority, based on implied authority, the plaintiff also establishes the "order/fault" component of a constructive change. Finally, despite the defendant's proffer of nonconformity with the contract terms, based on waiver, the plaintiff establishes sufficient cause for a favorable disposition on the claim of a constructive change. Thus, this Court affirms the defendant's liability for a constructive change.

Therefore, to summarize the liability findings of this Court, the plaintiff demonstrates entitlement to an equitable adjustment for the costs of the additional repairs as well as the costs of the additional maintenance under either a theory of nondisclosure of superior knowledge or constructive change.

## II. Damages

As of the initial filing of the complaint, the plaintiff sought an equitable adjustment in the amount of $57,118.19. In the pleadings presented to this Court at trial, the plaintiff adjusted the amount to $72,644.01 (herein adjusted to $75,615.21 by this Court because of a mathematical error by the plaintiff).

As an initial matter, citing *Santa Fe Eng'rs, Inc. v. United States,* 818 F.2d 856 (Fed.Cir.1987), the defendant argues that the larger damage amount represents "claims" not presented to the contracting officer and thus outside of the jurisdiction of this Court.

Because the plaintiff seeks only additional costs under the same claim(s), this Court rejects the defendant's jurisdictional argument. In *Santa Fe,* the United States Court of Appeals for the Federal Circuit reaffirmed the proposition that a party may not seek recovery at trial for claims not presented to the contracting officer. *Id.* at 858. The focal point of *Santa Fe* involves the claim and not the finiteness of the sums recited in the claim(s). In the instant case, the plaintiff seeks additional compensation not for new claims (*e.g.,* acceleration, improper specifications, misrepresentation, etc.) but for new matters inherent in the claims previously presented (*e.g.,* additional material, labor costs, etc.). The Claims Court has long recognized the distinction. *See J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 54 (1983) ("It would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court had to be submitted to the contracting officer before the court could continue to a final resolution on the claim."); *see also Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 417 (1987) ("If the complaint brought here is based on the same set of operative facts underlying the claim presented to the contracting officer, then this court has jurisdiction * * *."). Accordingly, as this Court allows the plaintiff's claim amount as amended, the Court now turns to the specifics of the instant damage computation.

An equitable adjustment encompasses the quantitative difference between the reasonable cost of performance without the added, deleted, or substituted work and the reasonable costs of performance with the addition, deletion, or substitution. *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 704, 412 F.2d 1360, 1370 (1969); *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 101–02, 324 F.2d 516, 519 (1963). Similar to an equitable adjustment, breach of contract damages encompass the same measure of damages, except breach damages allow for anticipated but unearned profits. *William Green Constr. Co. v. United States,* 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *Nolan Bros., Inc. v. United States,* 186 Ct.Cl. 602, 607, 405 F.2d

1250, 1253 (1969). Here, the plaintiff presents legal theories which allow recovery of both breach damages, for the nondisclosure of superior knowledge, and an equitable adjustment, for the constructive change. As the plaintiff only seeks recoupment of the additional costs associated with the repair and maintenance of the elevator systems, and not the recoupment of any unearned profits, the measure of damage nevertheless remains the same as that of an equitable adjustment. Accordingly, this Court considers the plaintiff's breach of contract damages pursuant to the nondisclosure of superior knowledge concomitantly with the plaintiff's claims for an equitable adjustment pursuant to the constructive change. Ironically, because this Court finds the Government equally liable under either legal or damage theory, the type of analysis truly comprises a distinction without a difference.

■ To prove the amount of an equitable adjustment, the burden of proof lies with the party who seeks the adjustment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1392 (Fed.Cir.1987); *Nager Elec. Co. v. United States,* 194 Ct.Cl. 835, 853, 442 F.2d 936, 946 (1971); *Commercial Contractors, Inc. v. United States,* 29 Fed.Cl. 654, 664 (1993). Yet, while the plaintiff clearly maintains the burden here, a claimant need not prove damages with "absolute certainty or mathematical exactitude." *Daly Constr. v. Garrett,* 5 F.3d 520, 522 (Fed.Cir.1993); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965). The Claims Court recently explained the general approach:

> In a number of extensive and complex contract cases, including the one at bar, exact computation of damages may prove to be extremely difficult. Therefore, courts have held that, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision. It is sufficient if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (citations omitted, emphasis in original). "It is sufficient if he [plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *see also Capital Electric Co. v. United States,* 729 F.2d 743, 746 (Fed.Cir.1984); *Jackson v. United States,* 12 Cl.Ct. 363, 366–67 (1987); *Addison Miller, Inc. v. United States,* 108 Ct. Cl. 513, 557, 70 F.Supp. 893, 900, *cert. denied,* 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947). However, "leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation, and resultant injury." *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. [662] at 737 (1984).

*American Line Builders, Inc. v. United States,* 26 Cl.Ct. 1155, 1181 (1992). With this understanding of the damage calculation as a baseline, this Court considers the plaintiff's calculation of damages.

### Repair Costs

■ In defining damages, the plaintiff requests that this Court apply a total cost method of damage calculation. Although the plaintiff presents actual costs for all of the repair items, because of the exigencies of proof for certain damages, the plaintiff maintains only estimates of the additional costs associated with the additional maintenance items. As a general rule, where a party possesses actual costs of the additional work, a court utilizes this preferred method of damage calculation in lieu of the total cost method or the jury verdict method. *Dawco Constr. v. United States,* 930 F.2d 872, 881 (Fed.Cir.1991). As the plaintiff presents proof of the actual costs for the repairs, this Court first considers those costs, including the three major repairs as well as the miscellaneous repairs.

First, the plaintiff seeks damages for the replacement of the field coils in passenger elevator No. 3. The direct labor costs for the repair by Miller totalled $4,608.45 (95 hours times $48.51 per hour), and the cost of repair

by Missouri Electric totalled $5,948.94. With the addition of $72.90 for overtime call-back service on the elevator, the actual costs of returning passenger elevator No. 3 to service totalled $10,630.29.

Second, the plaintiff seeks damages for rebuilding the motor in passenger elevator No. 18. The direct labor costs for the repair by Miller totalled $4,026.33 (83 hours times $48.51 per hour), and the cost of rebuilding by Missouri Electric totalled $5,984.53. With the addition of $64.80 for overtime call-back service on the elevator, the actual costs of returning passenger elevator No. 3 to service totalled $10,075.66.

Third, the plaintiff seeks damages for the replacement of the field coils and brake coils in passenger elevator No. 5. The direct labor costs for the repair by Miller totalled $4,026.33 (83 hours times $48.51 per hour) for the field coils and $396.16 (8 hours times $49.52 per hour) for the brake coils, and the cost of repair by Missouri Electric totalled $5,879.83 for the field coils and $920.77 for the brake coils. The actual costs of returning passenger elevator No. 5 to service totalled $11,223.09.

Finally, the plaintiff seeks damages for the miscellaneous repairs performed on various elevators throughout the contract term. Thus, in addition to the foregoing major repairs, the plaintiff seeks compensation for the labor and materials required to complete all the additional repair work as required under the terms of the Mart contract. As evidence of the labor expended in performing these repairs, the plaintiff presents time tickets for the following labor hours:

| Date | Elevator | Hours |
| --- | --- | --- |
| 11/23/87 | 3, 4 | 7.0 |
| 01/21–22/88 | 1, 2, 3 | 28.0 |
| 01/28/88 | 3 | 2.5 |
| 02/03/88 | 18 | 6.0 |
| 03/07/88 | 2, 4 | 9.0 |
| 03/08/88 | 1, 2, 3 | 12.0 |
| 03/19/88 | 2, 3, 4 | 17.0 |
| 03/28/88 | 2, 4 | 11.5 |
| 04/25/88 | 2, 3, 4 | 6.5 |
| 05/23/88 | 3, 5 | 12.0 |
| 07/18–21/88 | 1 | 42.0 |
| 08/01/88 | 1, 2, 4, 5 | 11.0 |
| 08/02/88 | 1, 5 | 6.5 |
| 08/03/88 | 1, 5 | 6.0 |
| 08/04/88 | 1, 5 | 8.0 |
| 08/05/88 | 1, 5 | 5.0 |
| 08/10/88 | 2, 4 | 2.0 |
| 08/24/88 | 3, 5 | 5.0 |

| Date | Elevator | Hours |
| --- | --- | --- |
| 09/01/88 | — | 11.0 |
| 09/02/88 | 3 | 3.0 |
| 09/13/88 | 18 | 1.0 |
| Total Hours: | | 212 |

Plaintiff's Post–Trial Brief, at 26–27. As the chart illustrates, the plaintiff seeks compensation for 212 labor hours, consisting of 111.5 hours under the mechanic rate of $48.51 per hour and 100.5 hours under the mechanic rate of $49.52 per hour. The per hour rate for elevator maintenance billed under the Mart contract between November, 1987, and June, 1988, totalled $48.51 ($25.05 for direct labor, $16.18 for general and administrative overhead, and $7.28 for profit), and the per hour rate for elevator maintenance billed between July 1988 and November 1988 totalled $49.52 ($25.96 for direct labor, $16.13 for general and administrative overhead, and $7.43 for profit): union agreements required a direct labor rate of $25.05 which changed to $25.96 as of July 1, 1988 per contract modification. Thus, the direct labor costs for the miscellaneous repairs by Miller totalled $10,-385.63 (111.5 hours times $48.51 per hour and 100.5 hours times $49.52 per hour). Further, the material costs for the miscellaneous repairs totalled $608.76. The actual costs of returning the passenger elevators to service pursuant to these miscellaneous repairs totalled $10,994.39.

In summary, the plaintiff presents actual costs for the three major repairs and the miscellaneous repairs as described above. In addition, for the material costs, the plaintiff also seeks overhead at a rate of thirty-two percent and profits at a rate of fifteen percent on the above described sums. The following summation demonstrates the costs of the additional repairs for which the plaintiff presents evidence of actual costs:

| | |
| --- | --- |
| Elevator No. 3 (less direct labor) | $6021.84 |
| Elevator No. 18 (less direct labor) | $6049.33 |
| Elevator No. 5 (less direct labor) | $6800.60 |
| Miscellaneous Elevators (less direct labor) | $608.76 |
| Subtotal | $19,480.53 |
| Overhead (32%) | $6233.77 |
| Subtotal | $25,714.30 |
| Profit (15%) | $3857.15 |
| Subtotal | $29,571.45 |
| Elevator No. 3 (direct labor) | $4608.45 |
| Elevator No. 18 (direct labor) | $4026.33 |
| Elevator No. 5 (direct labor) | $4422.49 |
| Miscellaneous Elevators (direct labor) | $10,385.63 |
| Total | $53,014.35 |

Plaintiff's Post–Trial Brief, at 33. In addition to the total of $53,014.35 in actual costs for the repair damages, the plaintiff also presented an invoice at trial dated November 14, 1988, for the removal and replacement of bad bearings in passenger elevator No. 5. Apparently, the invoice had not been included in the accounting of costs because of the lateness of the repair in relation to the initiation of the claim. In fact, as the plaintiff only proffered the invoice at trial, it disclaimed the recovery of profit and overhead on the material costs of $199.46 on the $2,130.74 receipt. As such, this Court allows the addition of the invoice to the total claim for actual costs, thus leaving a total of $55,145.09.

The defendant challenges the above actual costs based upon an audit conducted by the Office of Audits, Office of Inspector General, General Services Administration (GSAOIG). Mr. John Francis Walsh, an auditor with the GSAOIG, conducted the audit and testified at trial about the damages claimed by Miller in the instant claim. Based on an examination of the documentation of costs, the auditor challenged all of the costs claimed as unallowable by nonconformity with the terms of the Mart contract. *See* FAR 31.201–2(a)(4), 48 C.F.R. § 31.201–2(a)(4) (1992) (defining the five factors of allowability, including the fourth criterion of "[t]erms of the contract"). Based on the waivers recited above, however, this Court finds this decision unavailing. The auditor also challenged certain material costs issued by Missouri Electric: as the owners of Miller also own and operate Missouri Electric, the auditor questioned the validity of the transactions between Miller and Missouri Electric. Other than the assertion of "the lack of arm's length transactions," however, the auditor cited no evidence of impropriety. In fact, the General Manager of Missouri Electric testified that Missouri Electric provided elevator motor repair service for almost all (if not all) of the elevator companies in the St. Louis area. This Court reviewed the receipts issued by Missouri Electric and considered the testimony on this point from trial. Based on that evidence, this Court finds the proof adequately portrayed a fair business relationship between Miller and Missouri Electric. Finally, the

auditor also questioned the overhead rate of 32 percent, computing a proper overhead rate of 16.6 percent. The overhead rate claimed by the plaintiff, however, reflects the same rate as applied in the plaintiff's computations for the bid on the Mart contract. The Government accepted the bid, and this Court allows the same computations here. Accordingly, this Court rejects the auditor's challenges to the plaintiff's claim.

Thus, this Court affirms the recovery of the additional repair costs in the amount of $55,145.09.

Maintenance Costs

In addition to the evidence of actual costs for the major repairs and additional miscellaneous repairs required by the constructive change, the plaintiff also seeks compensation for the extra regular and routine maintenance performed as a result of the nondisclosure of superior knowledge. As referenced earlier, the damage remedy for nondisclosure of superior knowledge is a breach of contract, but as the plaintiff here seeks no anticipated profits, the manner of calculation of damages for an equitable adjustment for a constructive change remains the same; indeed, as recited earlier in this Opinion, this Court finds the Government equally liable for the damage sum at issue under *either* theory of liability. As such, the Court here simply conducts a damage calculation for an equitable adjustment for the damages incurred as a result of the nondisclosure. However, in contrast to the costs associated with the performance of work for the items of constructive change, which by their nature required specific documentation of costs, the performance of extra routine maintenance involved only recordation of time and no separation of the costs associated with the remodeling activities on the one hand and the regular and routine maintenance costs on the other. Accordingly, because of these uncertainties, the plaintiff requests a total cost allocation for these cost items.

■ In the pricing of equitable adjustments to Government contracts, the courts and boards have applied three methods of proof for the damage calculation: actual costs, total costs, and the jury method. AD-

MINISTRATION OF GOVERNMENT CONTRACTS, at 508–22. As the preferred means of proof, the actual cost method simply considers the actual cost data, as demonstrated above. In the absence of actual costs, under infrequent circumstances, the total cost method applies, however. This method calculates the monetary difference between the amount of costs anticipated in the bid price from the actual costs of performance plus profit. *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 190, 351 F.2d 956, 964 (1965). The Court of Claims as well as the Claims Court has allowed application of the total cost method where difficulty exists in determining the nature or amount of the added work. *J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–47 (1965); *American Line Builders, Inc. v. United States,* 26 Cl.Ct. 1155, 1182 (1992). Used even less frequently, this Court's predecessors have even allowed the calculation of damages based on the jury method whereby the court simply arrives at a reasonable computation of damages. *River Constr. Corp. v. United States,* 159 Ct.Cl. 254, 271, 1962 WL 9302 (1962); *Delco Elecs. Corp. v. United States,* 17 Cl.Ct. 302, 324 (1989), *aff'd,* 909 F.2d 1495 (Fed.Cir.1990). Despite the lack of "absolute certainty" and "mathematical exactitude" surrounding the plaintiff's calculation of damages, for the reasons stated below, this Court nevertheless finds that the plaintiff presents sufficient evidence to render a damage finding based on actual costs.

In the case at bar, the plaintiff computes the adjustment for the nondisclosure of superior knowledge as the difference between the number of maintenance hours historically required to service the Mart building and the number of maintenance hours required after the initiation of the renovation activities. As noted in the factual portion of this Opinion, the renovation efforts at the Mart building resulted in a threefold increase in the maintenance requirements for the plaintiff when computing both repair and maintenance labor hours. At trial, the plaintiff proffered the requisite number of hours required for the regular and routine maintenance of the elevators as 40.5 hours per month: the plaintiff ascertained this average based on the total number of per elevator maintenance hours required on the previous contract at the Mart building since 1986. After the initiation of renovation, however, the number of labor hours per month averaged seventy-five hours per month. In the damage calculation, generally, the plaintiff seeks an adjustment of approximately 34.5 labor hours per month (seventy-five hours per month minus 40.5 hours per month) times the number of months that the plaintiff performed the elevator maintenance at the Mart building during renovation activities, factoring in a labor rate of $48.51 per hour for labor hours prior to July 1, 1988 and a labor rate of $49.52 per hour for labor hours after July 1, 1988. The following diagram depicts the plaintiff's damage calculation:

| Description of Labor Hour | Total Labor Hours | Adjusted Labor Hours | Amount |
|---|---|---|---|
| Total Labor Hours (December 1987 through July 1988) | 600 | | |
| Less Standard Rate of Labor Hours (40.5) for Same Period | (324) | | |
| Subtotal of Labor Hours | | 276 | |
| Subtotal of Labor Rate ($48.51) | | | $13,388.76 |
| Total Labor Hours (August 1988 through October 1988) | 264.5 | | |
| Less Standard Rate of Labor Hours (40.5) for Same Period | 121.5 | | |
| Subtotal of Labor Hours | | 143 | |
| Subtotal of Labor Rate ($49.52) | | | $ 7,081.36 |
| Total of Adjustment | | | $20,470.12 |

Plaintiff's Post–Trial Brief, at 35.[3] As the

diagram demonstrates, the plaintiff expended

**3.** In the Plaintiff's Post–Trial Brief, the plaintiff erroneously computes the subtotal of adjusted labor hours for the August, 1988, through October, 1988, term as 83 labor hours. By subtracting the total labor hours during that term of 264.5 from the standard rate of labor hours of

600 labor hours from December, 1987, to July, 1988, and 264.5 labor hours from August, 1988, to October, 1988. The plaintiff maintains receipts for these labor hour expenditures, thus the labor hours represent actual costs. Based on the estimation that monthly labor requirements totalled 40.5 hours prior to renovation, the plaintiff thus multiplies the total labor hours expended, less the standard rate of 40.5 hours, factoring in the requisite labor rate. Thus, in the first term from December, 1987, through July, 1988, the plaintiff claims the expenditure of 600 labor hours on routine maintenance. As the standard monthly rate totalled 40.5, and the term spanned eight months, the plaintiff calculates that the standard labor hour rate of 324 hours, subtracted from the 600 labor hours actually expended, totaled 276 hours of additional maintenance. When multiplied by the labor rate for that term, the adjustment for the first term equals $13,388.76. Notably, even though the renovation began in November of 1987, and not December of 1987, and even though some mobilization and demolition work occurred as early as June of 1987, the plaintiff only seeks an adjustment for the term in which the regular and routine maintenance hours actually sustained a dramatic increase, that being in December of 1987. In the second term from August, 1988, through October, 1988, the plaintiff further claims an expenditure of 264.5 labor hours on regular and routine maintenance. As the standard monthly rate totalled 40.5, and the term spanned three months, the plaintiff calculates that the standard labor hour rate of 121.5 hours, subtracted from the 264.5 labor hours actually expended, totaled 143 hours of additional maintenance costs. When multiplied by the labor rate for that term, the adjustment for the second term equals $7,081.36. Thus, based on this damage calculation for the nondisclosure of superior knowledge, the plaintiff seeks a total adjustment of $20,470.12.

As noted above, the plaintiff seeks to prove this adjustment under the total cost method. Apparently, the plaintiff assumes that this calculation so closely approximates the total cost method that that method must apply, but when the computation of damages relies on estimates involving actual costs, actual costs and not total costs control. *See Servidone Constr. Corp. v. United States*, 931 F.2d 860, 862 (Fed.Cir.1991) (allowing a damage calculation by total costs only "where no other way to compute damages was feasible"). Thus, this Court rejects the plaintiff's request to apply a total cost method of damage calculation where, as here, the evidence demonstrates sufficient documentation to support *an estimation based on actual costs*. Indeed, the Court of Claims has approved of the use of such estimations. *Luria Bros. & Co. v. United States*, 177 Ct.Cl. 676, 705, 369 F.2d 701, 714 (1966). Accordingly, applying the actual cost method of damage calculation to the estimations of labor hours expended on additional maintenance at the Mart building per prior performance, this Court finds the plaintiff entitled to an additional equitable adjustment in the amount of $20,470.12.

The defendant challenges the above liability calculation for additional maintenance on three grounds. First, the defendant asserts that the plaintiff provides no basis to prove the validity of the hourly labor rates. As noted above, the plaintiff charged two labor hour rates throughout the term of the contract, a rate of $48.51 for the period from November, 1987, through June, 1988, and a rate of $49.52 for the period from July, 1988, to the expiration of the contract. The plaintiff testified that these rates reflected the requisite rates per union agreement for the time periods at issue, and this Court finds no basis to fault that claim. In addition, as clear repudiation of the defendant's objections, the Mart contract specifically provides for the labor rates applied to the above described costs, first as specified in the initial contract and later by contract modification.

121.5, the actual total adjusted labor hours totals 143 labor hours. The correction of this error results in an upward adjustment for this term, in amount from $4,110.16 to $7,081.36, with a corresponding upward adjustment in total maintenance costs from $17,498.92 to $20,470.12. Despite the lack of mathematical precision in the plaintiff's calculation, as the plaintiff provides the requisite proof of damages, this Court allows the plaintiff's approximation of costs as fair and reasonable. Accordingly, this Court corrects the calculation and allows the claim as adjusted by the Court.

Accordingly, this Court finds no grounds for the defendant's challenge to the labor rates.

Second, the defendant argues that the plaintiff failed to prove the adequacy of the 40.5 hour calculation for regular and routine elevator maintenance at the Mart building. To refute the plaintiff's calculation of 40.5 hours per month, the defendant proffered two items of evidence: the defendant pointed to the Government manual for elevator maintenance calculations which estimated elevator maintenance requirements at 20.5 hours per elevator per month (thus, 20.5 times 6 elevators equals 123 hours per month) and to the Government's estimation for the Mart contract of 12 hours per elevator per month (thus, 12 times 6 equals 72 hours per month). The disparity between the Government's own estimate (12 hours per elevator per month) and the Government manual (20.5 hours per elevator per month) discredit the Government's own proposition. Indeed, as the plaintiff explained, the performance of regular and routine preventative maintenance involves a process of coordinated events, whereby the elevator maintenance contractor conducts some jobs one week and others the next. By proper coordination, a contractor may meet the requirements of the contract in an efficient and timely fashion by overlapping jobs and responsibilities. The Government's own lower estimate of 72 hours per month reflects this fact, in contrast with the Government manual's estimation of 123 hours per month. In view of this distinction, the plaintiff's estimation of 40.5 hours per month seems reasonable. Thus, this Court finds the defendant's objections inapposite to the issue of monthly labor hour requirements for elevator maintenance.

Third, because the Government authorized additional maintenance throughout the term of the Mart contract, the defendant finds fault with the plaintiff's calculation of "extra" maintenance hours. As these extra labor hours fell outside the scope of this contract, however, this argument favors the plaintiff more than the defendant. The plaintiff has proven that it expended 600 labor hours during a period when 324 labor hours would be normal and 264.5 labor hours during a period when 121.5 labor hours would be normal.

Based on the differences in each period, 276 and 143 respectively, the plaintiff seeks the recoupment of the additional labor hours expended on regular and routine maintenance at the Mart building. The Government argues, however, that the labor hours well exceeded those recited by the plaintiff and therefore that the plaintiff had already been compensated for those unnamed labor hours. To the contrary, the Government merely proves the case that the plaintiff not only expended more than twice the normal labor hours required for elevator maintenance during these time periods, but in fact expended many more (albeit alternatively compensated). This showing in no way detracts from the plaintiff's claim to the extra costs associated with the additional maintenance hours. As a result, this Court reaffirms the plaintiff's entitlement to the additional labor hours expended under the Miller contract for the provision of regular and routine maintenance.

Thus, this Court affirms the recovery of the additional maintenance costs in the amount of $20,470.12.

Summary of Damage Findings

In summary, for the constructive changes to the Mart contract, the plaintiff seeks an adjustment of $55,145.09 for the extra repairs required by the mobilization, demolition, and renovation activities, and for the nondisclosure of superior knowledge by the Government of the contemplated renovation of the Mart building, the plaintiff seeks an adjustment of $20,470.12 for the additional maintenance costs. Thus, the plaintiff seeks a total of $75,615.21.

At trial, the bulwark of the defendant's general arguments denying damages involved the findings of the GSAOIG. The GSAOIG audit considered the costs claimed by Miller for the period between November, 1987, and September, 1988. In addition to conducting an audit of the costs and records, the auditor, Mr. Walsh, interviewed representatives of the GSA, including Mr. Martin and Mr. Sisk, representatives of Miller, including Mr. Gerngross and the accountant for Miller, Mr. Micholovish. The auditor concluded that Miller had failed to support many of the sums with the appropriate documentation as required under the Mart con-

tract. As discussed above, however, this Court finds that the GSA had waived the informational requirements of section H(2)(A)(1–2), H(2)(A)(3), and H(2)(A)(3)(a–f) of the Mart contract. In addition, based on the exigencies of the elevator maintenance requirements at the Mart building throughout the mobilization, demolition, and renovation activities, this Court further concluded that the plaintiff acted reasonably considering the extent of the damage and disrepair to the elevator systems within the Mart building. As the auditor failed to consider these exigencies, as clearly established by the Government's own testimony at trial, this Court finds the technical deficiencies inapposite where, as here, the contractor merely followed the instructions of the Government in performing the work required under the difficult conditions then present.

Based on the foregoing analysis of damages and proof calculations, this Court finds all of the heretofore recited costs as proper and reaffirms the plaintiff's entitlement to an equitable adjustment in the amount of $75,-615.21.

Pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13 (1988 & Supp. IV 1992), the plaintiff also seeks interest on the above cited sum from the date on which the plaintiff submitted the initial claim to the contracting officer. 41 U.S.C. § 611. The recovery of such interest remains well recognized and proper here. *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 862 (Fed.Cir.1991); *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1385 (Fed.Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983). Accordingly, this Court allows the plaintiff to recover interest on this equitable adjustment from the date of receipt of the claim by the contracting officer, on October 31, 1988.

■ Pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (1988), the plaintiff also requests the award of attorney fees prior to issuance of a final disposition. Despite the plaintiff's recitations of case law from other jurisdictions on this matter, this Court will entertain such a request only after compliance with the submission requirement *following* final disposition. 28

U.S.C. § 2412(d)(1)(B) ("A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action * * *."). Thus, any claim for attorney fees before final disposition is premature. *See J.M.T. Machine Co. v. United States*, 826 F.2d 1042, 1048 (Fed.Cir.1987) (finding a request for attorney fees before final disposition as "clearly premature"); *Skip Kirchdorfer, Inc. v. United States*, 803 F.2d 711, 712 (Fed.Cir.1986) (deeming a request for fees before judgment as premature); *see, e.g., Kellus v. United States*, 13 Cl.Ct. 538, 547 (1987); *North Bonneville v. United States*, 11 Cl.Ct. 694, 728, *aff'd in part and rev'd in part*, 833 F.2d 1024 (Fed.Cir.1987); *Dynamics Corp. of America v. United States*, 5 Cl.Ct. 591, 620 n. 27 (1984), *aff'd in part and rev'd in part*, 766 F.2d 518 (Fed.Cir.1985). As this Opinion represents such disposition, the plaintiff may apply for the recoupment of attorney fees, pursuant to section 2412(a) of the EAJA, within thirty days of the issuance of this Opinion.

## CONCLUSION

Accordingly, for the reasons stated above, this Court finds in favor of the plaintiff as to liability and damages. For the nondisclosure of superior knowledge, the defendant breached the implied duty of good faith and fair dealing and thereby caused the plaintiff to incur additional repair and maintenance costs without compensation. For the constructive change to the terms of the contract at issue, the defendant caused the plaintiff to incur similar costs. As this Court finds the defendant liable under either theory, for breach damages under the former and for an equitable adjustment under the latter, and as the plaintiff seeks only an adjustment in price, this Court orders an equitable adjustment in the favor of the plaintiff in the amount of $75,615.21, plus interest thereon from October 31, 1988, until time of payment.

Costs to the prevailing party.